## S11A1181. BATTLES v. THE STATE.

(719 SE2d 423)

THOMPSON, Justice.

Appellant Rodney Ennis Battles was convicted of malice murder and related offenses in connection with the shooting death of Shamshamer "Rocky" Tucker.[1] He appeals asserting, inter alia, trial counsel was ineffective because he impeached his own witness, Dr. Cindy Gartmond, with a first offender guilty plea. Finding no error, we affirm.

1. Viewing the evidence in a light favorable to the verdict, as we are bound to do, we find the following: At about 1:00 a.m., on Sunday, July 2, 2006, Tucker and his wife, Rupinder "Ruby" Tucker, arrived at their home after closing the family business for the night. As they pulled into the driveway, an unfamiliar pickup truck drove up behind them and blocked them in. Two young men exited the truck and approached the Tuckers, one on each side of their car. The young men brandished handguns and demanded money and valuables. Rocky reached for a pistol which he kept in his car and the young men opened fire, shooting at both Rocky and Ruby. Rocky, who was shot four times, was fatally wounded, but he was able to return fire as the young men made their escape. Ruby, who was pregnant, escaped serious injury.

Ruby is five feet tall. She immigrated to the United States from India and spoke very little English. Although she was profoundly traumatized and had been given a sedative, she was able to tell police, through an interpreter, that the assailants were slim, six feet tall, and in their late teens or early to mid-twenties. She added that one of the assailants was wearing a black t-shirt and dark shorts.

Police recovered Rocky's pistol, as well as a number of casings, bullets and bullet fragments. Based on this evidence, they were able to determine that three different handguns were used at the scene. Each handgun, including Rocky's, was a .45. Rocky's handgun was loaded with hollow point bullets. The other two handguns used full metal jackets.

Late in the day, on July 2, appellant's mother telephoned Dr. Cindy Gartmond, who was a close friend, and told her that appellant

---

[1] The crimes occurred on July 2, 2006. Appellant was indicted and charged with malice murder, two counts of felony murder, two counts of aggravated assault upon Rocky Tucker, and two counts of aggravated assault upon Ruby Tucker. Trial commenced on November 26, 2007, and the jury returned its verdict, finding appellant guilty on all counts, on December 4, 2007. The trial court sentenced appellant to life imprisonment for malice murder; it merged and vacated the remaining counts. See *Malcolm v. State*, 263 Ga. 369 (434 SE2d 479) (1993); but see *Maddox v. State*, 277 Ga. App. 580 (627 SE2d 166) (2006) (kidnapping counts, one for male victim, one for female victim, do not merge). Appellant's timely filed motion for new trial was denied on January 7, 2011. Appellant filed a notice of appeal on January 19, 2011. The case was docketed in this Court for the April term and orally argued on July 18, 2011.

had been shot in the thigh. Gartmond was a pediatrician who last treated appellant a number of years earlier, when he was thirteen years old. When appellant's mother described the wound, Gartmond advised that appellant did not need to go to an emergency room, but that he should come to her office the next day for treatment.

Appellant appeared at Gartmond's office the following morning. He told Gartmond that he accidentally shot himself while driving his car three days earlier. Gartmond cleaned and treated the wound. Hours after appellant left, Gartmond called police to report a gunshot wound, and appellant became a person of interest.

Police prepared a photographic lineup containing twelve pictures, one of which was a picture of appellant. The lineup was shown to Ruby, and she positively identified appellant as one of the two assailants who shot her husband. Appellant was arrested several days later. He was 5'5" tall and weighed 140 pounds.

Initially, appellant told police he was shot in the leg when he was "getting robbed on Wesley Chapel." When the interviewer said that was not believable, appellant changed his story, telling police he shot himself while he was driving as he picked up his handgun and accidentally pulled the trigger.

Police found a .380 pistol in appellant's room. There was a bullet hole in the driver's seat of appellant's automobile and a .380 — full metal jacket — bullet on the floorboard. There was no blood on either the car seat or the bullet. There was no gunpowder residue or stippling on the car seat.

Police also recovered a black t-shirt and a pair of denim shorts belonging to appellant. There was no gunpowder residue on either the t-shirt or the shorts, but there was blood. The t-shirt had a "cookie cutter" hole in it. A ballistics expert opined that a hole of that kind would have been made by a hollow point bullet, not a full metal jacket.

Appellant was given a polygraph examination pursuant to a stipulation that the results would be admissible at trial. The examiner testified that appellant was being deceptive when he denied that he shot at Rocky.[2] Another polygraph expert, who reviewed the results of appellant's examination, averred that there was one chance in a hundred that appellant was being truthful.

The evidence was sufficient to enable any rational trier of fact to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[2] According to the examiner, a score between 6 and minus 6 would be inconclusive; a score greater than 6 indicates truthfulness; and a score less than minus 6 indicates deception. Appellant received a score of minus 19.

2. During direct examination, Dr. Gartmond opined that appellant's gunshot wound was inflicted several days before appellant presented to her on Monday, July 3, and that, in any event, appellant could not have been wounded as late as Sunday morning, July 2. Gartmond based her opinion on the appearance, i.e., the amount of granulated healing, of appellant's wound.[3] As appellant's counsel neared the end of direct examination, he asked the trial court whether it would permit the State to impeach Dr. Gartmond based on a prior conviction, and the trial court replied that a witness can be impeached for a conviction involving moral turpitude. Thereupon, the following colloquy occurred:

Q. Dr. Gartmond, at the time that you rendered treatment to [appellant], on July 3rd, 2006, were you a licensed physician in the State of Georgia?
A. Yes, sir.
Q. Has there ever been any period of time where your license has not been active in the State of Georgia?
A. Yes, sir.
Q. Has there ever been a time where it has been suspended?
A. Yes.
Q. Can you explain to the jury just briefly — very briefly the nature of the suspension?
A. My license was suspended for 60 days this year. It began in April and ended in August, actually, and it was due to a misdemeanor plea.
Q. Okay, and did that — did the plea have anything whatsoever to do with your provision of treatment and care of patients?
A. No, sir.
Q. What did it have to do with?
A. Strictly a billing issue.
Q. Okay, all right. And as a result of that, is that — you are licensed today?
A. Yes, sir.

The prosecution followed up this line of questioning on cross-examination:

Q. [O]n direct examination, you were explaining to the jury that you pled guilty to a misdemeanor and your license was suspended; is that correct?

---

[3] In this regard, Gartmond testified that granulation usually occurs between the second and fifth day post-injury.

A. That's correct.

Q. Isn't it true that you pled guilty to ten counts of theft by taking?

A. That's the misdemeanor; isn't that correct?

Q. Isn't it true that you stated to the jury that it had something to do with billing issues, but . . . it was Medicaid fraud as well?

A. That was the billing issue.

Thereupon, the prosecution introduced a certified copy of Dr. Gartmond's sentence for ten counts of misdemeanor theft by taking. The sentence was entered pursuant to a negotiated *Alford* plea for which Gartmond was given first offender treatment.

Appellant asserts trial counsel rendered ineffective assistance because his direct-examination of Dr. Gartmond led to her impeachment with a first offender plea.[4] In a related claim, appellant posits that trial counsel was deficient for failing to object to the court's instruction on impeachment through a crime of moral turpitude.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Terry v. State*, 284 Ga. 119 (2) (663 SE2d 704) (2008), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, it is not incumbent upon the reviewing court to examine the other prong. *Fuller v. State*, 277 Ga. 505 (3) (591 SE2d 782) (2004).

At a hearing upon appellant's motion for new trial, trial counsel averred that he was unaware that a first offender plea cannot be used for impeachment purposes. He admitted, however, that to maintain Dr. Gartmond's credibility as an expert medical witness, it was necessary to establish that she was suspended for matters unrelated to her ability to practice medicine. Based, in part, upon this admission, the trial court determined that trial counsel pursued an objectively reasonable trial strategy by asking Gartmond why she had been suspended from the practice of medicine, and that, therefore, appellant failed to prove deficient performance. The trial court also concluded that, even if counsel were deficient, appellant cannot meet the prejudice prong of *Strickland*.

In reviewing the trial court's decision, we accept its factual

---

[4] See generally *Butler v. State*, 285 Ga. 518 (678 SE2d 92) (2009) (first offender record cannot be used to impeach witness by showing crime of moral turpitude).

findings and credibility determinations unless they are clearly erroneous, and we independently apply the legal principles to these facts, *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003), keeping in mind the strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. *Harris v. State*, 280 Ga. 372, 374 (3) (627 SE2d 562) (2006). Giving due deference to the trial court's factual and credibility determinations, we conclude, as did the trial court, that trial counsel pursued a reasonable trial strategy. The prosecution was poised to impeach Dr. Gartmond's credibility by showing that her license was suspended. It was reasonable for trial counsel to preempt this line of attack by showing that Gartmond was suspended for reasons unrelated to her medical expertise. And we note, in this regard, that trial counsel did not inquire about a "misdemeanor plea" — he simply asked Gartmond why she was suspended. It was Gartmond who injected the guilty plea issue.

Even if it can be said that trial counsel rendered deficient performance, we agree with the trial court that appellant failed to demonstrate he was prejudiced to the extent that there is a reasonable likelihood the outcome of the trial would have been different. That is because, although appellant characterizes Dr. Gartmond as a critical witness who would have been deemed credible but for evidence of her plea, the reality is that her credibility already was suspect: Gartmond was a close friend of appellant's mother. She treated appellant until the age of thirteen, and she treated appellant's sister. When appellant's mother telephoned Gartmond to tell her about appellant's gunshot wound, Gartmond told her appellant did not need to go to an emergency room — that she would see him in her private office. After treating the wound, Gartmond waited hours before telephoning police, and she spent the next day, July 4, with appellant's family. Moreover, her records show that she treated appellant's right leg when he was wounded in the left. Finally, and most importantly, Gartmond was a pediatrician with no expertise in gunshot wounds or wound care.[5]

3. After the trial, and before the hearing on his motion for new trial, appellant sought to have his experts examine and test the physical and scientific evidence used against him. He asserts the trial court wrongfully denied him access to this evidence and, therefore, he is not able to determine if trial counsel was ineffective for failing to procure experts to examine and test the evidence prior to trial. This assertion is without merit. New counsel made no showing that, even if he had been granted access to the evidence in question,

---

[5] The doctor had not even seen a gunshot wound for more than 17 years.

favorable testing results would have revealed that the outcome of trial would have been different had trial counsel pursued such testing. *Crawford v. State*, 278 Ga. 95, 99 (2) (b) (597 SE2d 403) (2004) (trial court properly denied defendant hearing on post-trial motion to access DNA evidence where, even assuming the reality of DNA testing results hypothesized by defendant, "such results would not in reasonable probability have led to [the defendant's] acquittal . . . if they had been available at [his] trial"). See also *Smith v. State*, 288 Ga. 348, 352 (8) (703 SE2d 629) (2010) (to succeed on ineffective assistance of counsel claim, defendant must show that "trial counsel's performance was deficient and that there is a *reasonable probability that the trial result would have been different* if not for the deficient performance") (emphasis supplied).

Here, appellant has not even articulated what favorable result could be obtained from re-testing the scientific evidence in question, let alone how any favorable testing results may have affected the result at trial. Accordingly, the trial court properly denied appellant's request to re-test the scientific evidence and properly concluded that his ineffective assistance of counsel claim was without merit.

4. Following the pattern charge on polygraph evidence, the trial court charged the jury as follows:

> There has been certain evidence admitted during the trial concerning a polygraph test and the polygraph examiner's opinions and conclusions as to its results. Polygraph evidence is considered opinion evidence and is governed by the law concerning opinion evidence as has been given to you. A polygraph examiner's opinion can only be used to indicate whether, at the time of the polygraph examination, the defendant believed that he was telling the whole truth. You are not bound by the polygraph examiner's conclusions, and the examiner's testimony is not controlling on the issue and may be entirely disregarded by you. It is for you to decide what weight, if any, should be given to the evidence concerning the polygraph exam, its results, and the examiner's opinions and conclusions.

In view of the fact that appellant and the State stipulated to the admissibility of polygraph evidence, we must conclude that the charge was an accurate statement of the law, *State v. Chambers*, 240 Ga. 76, 80 (239 SE2d 324) (1977), and trial counsel was not ineffective for failing to object to it.

5. Lastly, appellant claims the trial court erred in admitting evidence that at the time of his arrest, appellant was carrying "some green leafy substance in his pockets." In this regard, appellant

asserts the evidence was irrelevant and prejudicial. See *Nichols v. State*, 282 Ga. 401, 403 (651 SE2d 15) (2007). However, appellant did not object specifically to this evidence. On the contrary, appellant moved in limine to exclude evidence that at the time of his arrest appellant was in possession of "marijuana." In this regard, appellant pointed out that the substance in his possession "was not tested, we don't know what it was" and the trial court ruled that, inasmuch as the substance could not be identified as marijuana, it could be referred to only as a "green leafy substance." No additional objection was raised; it follows that any error was waived.

> Although a party does not waive an error by failing to object to admission of evidence after a motion in limine is denied (*Harley-Davidson Motor Co. v. Daniel*, 244 Ga. 284, 285-286 (1) (260 SE2d 20) (1979)), this rule cannot be invoked to preserve a different, if perhaps related, error. See *Wilkins v. State*, 220 Ga. App. 516, 517 (1) (469 SE2d 695) (1996). To allow such a procedure would deprive the trial court of the opportunity to consider the error alleged, and take corrective action, if necessary.

*Ward v. State*, 238 Ga. App. 540, 542 (2) (519 SE2d 304) (1999). *Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 7, 2011 —
RECONSIDERATION DENIED NOVEMBER 30, 2011.

*Brian Steel*, for appellant.
*Robert D. James, Jr., District Attorney, Leonora Grant, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sara K. Sahni, Assistant Attorney General*, for appellee.