**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 19, 2013**

# In the Court of Appeals of Georgia

A12A2296. THE STATE v. WOFFORD.

PHIPPS, Presiding Judge.

Chad Randall Wofford was charged with committing five sexual offenses against his girlfriend's two daughters, V. H. and O. H.: (i) rape of V. H.; (ii) aggravated child molestation of V. H., by having her place her mouth upon his penis; (iii) aggravated child molestation of V. H., by placing his mouth upon her vagina; (iv) child molestation of V. H., by rubbing her vagina with a vibrator; and (v) aggravated child molestation of O. H., by placing his mouth upon her vagina. A jury found Wofford not guilty of rape and guilty of the remaining four counts. Convicted on those four counts, Wofford filed a motion for new trial. The trial court granted the motion on the ground that Wofford's trial counsel had rendered ineffective assistance

by failing to call certain individuals as defense witnesses. In this direct appeal,[1] the state contends that the trial court's ruling was error for reason that Wofford failed to satisfy the two-prong test of *Strickland v. Washington*.[2] We agree with the state and therefore reverse the order granting Wofford a new trial.[3]

*The Trial*

At Wofford's trial, which was held in 2009, the state's witnesses testified to the following. During the time period alleged in the indictment, between January 1, 2004 and September 19, 2005, Wofford lived with his girlfriend, V. H. and O. H.'s mother. The girls lived out of state with their father during the 2004 - 2005 school year and thus attended school there during that school year. There were ongoing child custody issues, and at some point, the girls returned to live with their mother (and Wofford) in Georgia, where they began the 2005 - 2006 school year.

---

[1] OCGA §§ 5-7-1 (a) (7) (authorizing the state to appeal an order granting a motion for new trial); 5-7-2 (b) (2) (providing that a certificate of immediate review shall not be required from an order described in OCGA § 5-7-1 (a) (7)).

[2] 466 U. S. 668 (104 SCt 2052, 80 LEd2d 674) (1984).

[3] This is the second appeal in this case before this court. In *Wofford v. State*, 299 Ga. App. 129 (682 SE2d 125) (2009), this court affirmed the trial court's denial of Wofford's motion for discharge and acquittal, in which he claimed that his constitutional right to a speedy trial was violated.

On August 29, 2005, then nine-year-old V. H. was sent from her classroom to the school counselor's office. V. H. had gotten into trouble in her fourth grade class, and she was angry. During her session with the counselor, V. H. said that Wofford had touched her private parts. The counselor asked her where Wofford had touched her, and V. H. pointed from her neck to her knees and indicated that the touching had been underneath her clothing. V. H.'s mother was summoned to the school, and V. H. repeated her claim to her mother. The counselor called the police and spoke to a police officer. No police officer came to the school; instead, the mother took both V. H. and her younger daughter, then seven-year-old O. H. who was in the second grade, from the school so that they could go to the police station.

At about 6:00 p.m., the three of them arrived at the police station. A police officer interviewed each girl separately. When the officer was distinguishing between the truth and imagination, V. H. told him that people had not believed her when she told them that she had once gotten a portal to open into a magical realm, but that when she tried to jump through it, she got her shoes wet because the portal had closed.

Regarding her allegation made earlier that day, V. H. told the officer that she had reported to the school counselor that Wofford had given her a "bad touch."

3

Specifically, V. H. said, Wofford had given her a backrub, which she considered a "bad touch" because her father had never given her a backrub. The officer asked V. H. whether she wanted to tell him anything else, and she said no.

Similarly, when the officer interviewed O. H., she said that Wofford had given her a backrub. O. H. volunteered that, earlier that day, she had reported such to the school counselor, adding that her father had never given her a backrub. Having already been apprised that O. H. was perhaps a witness, but not an alleged victim, the officer ended the interview with O. H. The officer closed the investigation as to both girls, concluding that there was insufficient cause to proceed. Both interviews had been recorded onto a DVD, which was played at trial for the jury.

About two weeks later, on the afternoon of Friday, September 16, the school psychologist met with V. H. to evaluate whether the child, who had received special educational services during a prior school year, remained eligible for services that school year. During that evaluation, V. H. told the psychologist that she had lied to police concerning Wofford and that Wofford had done bad things to her. Then V. H. refused to talk further about it. The psychologist testified that, at school, V. H. was "oppositional to teachers, to staff. She would do things to get out of trouble, so in that regard she was manipulative. Whenever she was in trouble, she would try to

4

manipulate the situation to get out of trouble." Further, the psychologist described that when she met with V. H., the child sometimes "made fantastical types of statements. She had a very active fantasy world. . . . She would tell stories that involved witches, warlocks, having a friend who could read other people's minds, those types of things." Nevertheless, the psychologist relayed to the school's assistant principal V. H.'s claim that she had lied to police.

The following Monday morning, September 19, the school's assistant principal met with V. H., who told her that she had lied to police. V. H. was ushered back to the counselor's office. The child was again very upset. After the assistant principal left, V. H. told the counselor that she had lied to the police. The counselor asked V. H. to write down what had happened. V. H. wrote that Wofford had licked her breast and vagina, rubbed his penis on her vagina, that white liquid had come out of his penis, and that he had made her watch videos of individuals having sex; V. H. also wrote that Wofford had done these acts at night, when her mother was at work. The counselor called the police again. This time, the counselor did not call the child's mother.

A police detective with specialized training in investigating child physical and sexual abuse went to the school and talked with the counselor, was given V. H.'s

handwritten note, and separately interviewed V. H. and O. H. V. H. affirmed that she had written the note he had received from the counselor. When O. H. was interviewed, she said that she had something to report, but did not feel comfortable speaking it. So she wrote that Wofford had licked her breasts and private part and that Wofford had done something to her sister V. H., but she did not know what. The detective took both girls to a sexual assault center to proceed with extensive interviews and physical examinations. (The detective also contacted the children's mother, as well as the Department of Family & Children Services (DFCS).) Meanwhile, V. H. wrote a second note: "Dear mommy, I'm sorry that I lied. Love, [V. H.]." V. H. never gave the note to her mother; instead, the note was soon passed to the detective.

At the sexual assault center, the police detective interviewed each girl separately. V. H. said that, on numerous occasions, Wofford had touched her vagina, put his mouth on her vagina and breasts, and forced her to put her mouth on his penis. She said that she had touched Wofford's penis and described it with words such as "hard," "rubbery," and "squishy." Five or six times, V. H. recounted, Wofford's penis had "squirted" what she described as "white liquid" that was "warm" and also "sticky." V. H. claimed that, about a month before, Wofford had tried to put his penis

6

in her vagina. The sexual encounters with Wofford, V. H. estimated, had been going on for about a year, typically occurring when her mother was at work. She said that Wofford had threatened to harm her if she ever told anyone about what he was doing. During the interview, V. H. was asked about the note she had written to her mother; the child said that, when she previously told the (first investigating) officer that Wofford had only given her a backrub, she was lying *for* her mother; the child expressed concern that DFCS and the "court" would get involved with their family and that her mother would lose custody of her. In addition, V. H. said, her mother had "bribed" her with candy and "McDonald's." The interview was recorded onto a DVD, which was played at trial for the jury.

When the police detective interviewed O. H., she said that Wofford had massaged her buttocks inside her panties and had touched and licked her vagina. She stated that this had occurred about three months before, when she was on a school break. She also claimed that, in her presence, Wofford had watched movies that depicted adults having sex, that he had "tickled" his private part, and that white liquid had come out of his private part. O. H. told the detective that, two or three times, Wofford had squeezed her hand around his private part, which she described as "squishy," with "bones" in it, and soft on the top. The child described that Wofford

had used a sexual device on her, at one point inserting it into her vagina. O. H. said that she had not told the truth when she previously talked to a police officer because talking to people she did not know made her nervous and because she was afraid that Wofford would go to jail. This interview was recorded onto a DVD, which was played at trial for the jury.

That same day, September 19, 2005, each girl was examined by a nurse who was qualified at trial as an expert in sexual assault medical examinations. The nurse testified that V. H. had told her that Wofford had touched her inappropriately, that his private part had touched her private part, that Wofford had placed her mouth on his penis, that she had seen sticky, white liquid come out of his penis, and that he had threatened her not to tell anyone. O. H. told the nurse that Wofford had licked her private part and had made her touch and rub his penis. The nurse found no sign on either girl of vaginal penetration or residual injury. But according to the nurse, in cases of delayed reporting, which the nurse defined as reporting more than 72 hours after an alleged sexual incident, "only in 5 percent of the time do we find injury."

The next week, the police detective interviewed V. H. again. During that interview, V. H. said that Wofford had touched her private part with a vibrating machine.

8

V. H. and O. H. testified at trial. V. H. was then 13 years old and testified that Wofford had rubbed his penis on her vagina and inserted it into her vagina, rubbed a vibrator on her vagina and inserted it into her vagina, forced her mouth onto his penis, and placed his mouth on her vagina. These incidents occurred when her mother was at work. Wofford had threatened her that he would kill her, her mother, her sister, and her grandmother if she told anyone. Angry at Wofford because of what he was doing to her and wanting him out of the home, she would make up "random excuses" to her mother about why Wofford should have been made to leave. Meanwhile, she resolved to otherwise deal in secret with Wofford's sexual abuse. But when she suspected that he also had been inappropriately touching O. H., she exposed Wofford's sexual abuse because she wanted to protect her younger sister.

V. H. was asked at trial why, after initially stating to the school counselor that Wofford had touched her inappropriately, she told the police officer that Wofford had only given her a backrub. She answered that, on the way to the police station, her mother promised her candy and "McDonald's" if she would say that Wofford had only given her an uncomfortable backrub and had not touched her underneath her clothing. V. H. testified that what she said to the first police officer – that Wofford had only given her a backrub atop her clothing – was a lie. Additionally, V. H.

9

revealed at trial that, during that time (August and September 2004), her parents were battling over child custody issues and she was worried that she would be taken from her mother and sent to live with her father, which she did not want. But even after recanting her initial allegation, she testified at trial, she again told school personnel about Wofford's conduct, and she acknowledged at trial that she had written the note: "Dear mommy, I'm sorry that I lied. Love, [V. H.]."

O. H. was twelve years old at trial. She testified that on various occasions during the time Wofford lived with them, he licked her vagina, rubbed his private part against her private part, masturbated in her presence while watching a pornographic movie, and placed her hand on his private part one night while she pretended to be asleep. She had never told her mother about these sexual encounters until after Wofford was arrested because V. H. had told her that Wofford had threatened to kill her mother if either one of them told.

Wofford did not testify and did not call any witnesses. However, defense counsel's cross-examination of the state's witnesses and closing argument show a strategy employed of attacking the credibility of V. H. and O. H. and arguing that the state's case – which lacked any corroborating medical evidence – fell short of proving beyond a reasonable doubt the elements of the charged crimes.

10

*On Motion for New Trial*

On motion for new trial, Wofford complained that his trial lawyer did not seek to impeach V. H. by calling as defense witnesses two of that child's former school teachers. At the new trial hearing, Wofford called these teachers to the stand. A special education teacher, who had taught V. H. during a part of the 2003 - 2004 school year, was asked whether V. H. had a reputation in the school community for truthfulness or untruthfulness; the teacher responded, "She definitely had times when she was not truthful."[4] That teacher further testified that, "at [V. H.'s] age and where she was emotionally" during that school year, she would not have believed the child under oath. The second teacher called by Wofford at the new trial hearing had taught V. H.'s kindergarten class during the school year 2002 - 2003; she testified that V. H. had a reputation in the school community for untruthfulness and that, at that time, she would not have believed V. H. under oath.

---

[4] But see *Riggins v. State*, 279 Ga. 407, 408-409 (2) (614 SE2d 70) (2005) (noting that eliciting a teacher's testimony that a student would lie when in trouble so as to divert responsibility from himself failed to follow proper procedure for impeaching student); *Callahan v. State*, 256 Ga. App. 482, 486 (3) (a) (568 SE2d 780) (2002) (determining that the victim's credibility was not impeached by stepmother's statement to police that the victim made up stories when he got into trouble, where the stepmother did not testify to the victim's general reputation for truthfulness in the community or whether she would believe him under oath).

On cross-examination by the state at the new trial hearing, V. H.'s kindergarten teacher conceded that she was unable to testify as to V. H.'s reputation for truthfulness at the time of the 2009 trial. Likewise, the teacher of V. H.'s class during school year 2003 - 2004 conceded on cross-examination at the new trial hearing that she had no way of knowing whether V. H. was truthful at the time of Wofford's trial because "[V. H.] wasn't in my class long enough for me to get a real feel for how she would be progressing"; she added, "I didn't know her after . . . she was in my classroom." Neither of the two teachers proffered any impeachment testimony as to O. H.

Wofford's trial lawyer was called to the stand and asked whether he had been aware of those two teachers prior to trial. The lawyer answered that he had not known any specifics about those particular teachers, although their "names may have been on a report done by [a doctor]." But that doctor was then suffering from dementia and other health issues, and the lawyer concluded that the doctor could offer nothing helpful to the defense.

The lawyer went on to testify on motion for new trial about the trial defense employed. His investigation of the case had included going to the girls' elementary school and meeting with "most of the teachers that were involved in this case." Also,

12

he had subpoenaed and reviewed V. H.'s school records, and read numerous DFCS reports concerning the girls' family environment around the time in question. And at trial, although he had not called as impeachment witnesses the two teachers at issue here, he had attacked the credibility of both V. H. and O. H. through cross-examination of not only the girls, but also the state's other witnesses.

Wofford's trial lawyer gave numerous examples. For instance, he pointed out at the new trial hearing that, with V. H. on the stand, he asked her to explain why – if her mother had been the one to propose a lie to police about Wofford's conduct – she (V. H.) would thereafter write a note *to her mother* apologizing for delivering to police the proposed lie. The girl answered, "I'm not sure. I don't remember." Wofford's trial lawyer further elicited V. H.'s testimony that she would make up "random excuses" to get Wofford out of their home. In addition, with various witnesses on the stand, the lawyer pursued questioning so as to emphasize that the girls gave varying accounts about Wofford. As an example, the lawyer elicited testimony from the police detective to call attention to the fact that V. H. had mentioned the use of a vibrator during her second interview with him, but not during her first interview with him.

Additionally, Wofford's trial lawyer pointed out at the new trial hearing, he had sought to highlight for the jury that other outcry witnesses had concerns about V. H.'s veracity. Hence, he had elicited from the school counselor, "I remember at the time [of the V. H.'s initial allegation in August,] my concern was that she had exaggerated stories and I didn't know whether or not it was true. . . . I remember [V. H.] telling me she was mad at [Wofford]." And from the school psychologist, Wofford's trial lawyer elicited on cross-examination testimony that V. H. had a tendency to overreact to minor disappointments and that "her coping mechanisms were not good."

After the hearing, the trial court entered an order granting Wofford a new trial, stating therein that "[t]rial counsel testified that he didn't call [the two teachers at issue] because he didn't know about them." Those two teachers, the trial court continued, "were familiar with [V. H.] and knew her prior to the time [Wofford] came into her life," and "the credibility of V. H. is particularly crucial to this case." Thereupon, the court ruled,

> Given the unique circumstances of this case and the nature of the evidence presented, this Court cannot say this testimony would probably have little or no impact on the jury's consideration of the case. The Court is compelled to find that the failure to present this evidence fell

14

below a reasonable standard of professional assistance and that the failure was prejudicial to the Defendant's case.[5]

*The Instant Appeal*

1. The state contends that the trial court erred by granting Wofford a new trial, arguing that Wofford did not carry his burden of demonstrating ineffective assistance of trial counsel. We agree.

To prevail on an ineffectiveness claim, a defendant must establish, pursuant to *Strickland v. Washington*,[6] that counsel's performance was deficient and that the deficient performance was prejudicial to his defense.[7] Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact.[8] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[9]

---

[5] Further, the trial court pertinently stated in its order that it had "reviewed the remaining allegations and find none that would justify granting the Motion."

[6] Supra.

[7] *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[8] *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[9] Id. at 88 (4).

15

(a) *Performance Prong*. The alleged deficiencies in this case fell under the rubric of trial strategy.[10]

> The manner in which an attorney attacks the credibility of a witness falls within the ambit of trial tactics. In assessing selection of trial tactics, every effort must be made to eliminate the distorting effects of hindsight and the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance as even the best criminal defense attorneys would not defend a particular client in the same way.[11]

"The decisions on which witnesses to call, whether and how to conduct cross examinations, . . . and all other strategies and tactical decisions are the exclusive

---

[10] See *Payne v. State*, 289 Ga. 691, 697 (3) (b) (715 SE2d 104) (2011) (decisions about what questions to ask on cross-examination are quintessential trial strategy); *Washington v. State*, 276 Ga. 655, 659 (3) (a) (581 SE2d 518) (2003) (manner in which an attorney attacks the credibility of a witness falls within ambit of trial tactics); *Pickard v. State*, 302 Ga. App. 483, 487 (1) (b) (i) (691 SE2d 569) (2010) ("The manner in which an attorney chooses to attack a witness'[s] credibility falls within the ambit of trial tactics.").

[11] *Washington*, supra (citations and punctuation omitted); see *Hamilton v. State*, 274 Ga. 582, 589 (13) (555 SE2d 701) (2001) (reiterating that "a reviewing court must be highly deferential to [strategic or tactical] choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy"); but see generally *Benham v. State*, 277 Ga. 516, 518 (591 SE2d 824) (2004) (reiterating that invoking the words "tactics" and "strategy" does not automatically immunize trial counsel against a claim that a tactical decision or strategic maneuver was an unreasonable one no competent attorney would have made under the same circumstances).

16

province of the lawyer after consultation with his client."[12] Wofford did not testify at the new trial hearing; and he cites nothing in the record, nor does he make any assertion, that his trial lawyer did not consult with him concerning strategies and tactics for the defense.

> While other counsel, had they represented [Wofford], may have exercised different judgment, the fact that trial counsel chose to try the case in the manner in which it was tried, and made certain difficult decisions regarding the defense tactics to be employed with which [Wofford] . . . [later disagreed], does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.[13]

Rather, to show deficient performance,

> a defendant must demonstrate that counsel's performance was not reasonable under the circumstances confronting counsel at the time, without resorting to hindsight. Rather than focusing on what [the additional evidence] would have shown had it been sought, the proper

---

[12] *McDaniel v. State*, 279 Ga. 801, 803 (2) (c) (621 SE2d 424) (2005) (citation and punctuation omitted).

[13] *Reed v. State*, 285 Ga. 64, 66 (6) (673 SE2d 246) (2009) (citations and punctuation omitted); see *Pickard*, supra at 487 (1) (b) (ii) (noting that, although appellate counsel may have conducted the trial differently, this does not mean that the defendant did not receive a vigorous and complete defense, and finding that the record indicated otherwise).

emphasis is on whether counsel's actions, under the circumstances then existing, were reasonable.[14]

Here, the trial court noted in its order that "[t]rial counsel testified that he didn't call [the two teachers at issue] because he didn't know about them." But notably, the court made no express finding that the lawyer reasonably should have known about them. Wofford asserts in his brief that certain reports in the record "include the names of the teachers called at the motion for new trial" hearing; the cited pages of the appellate record, however, do not.[15] And at any rate, Wofford did not show on motion for new trial that the reports otherwise reasonably put his trial

---

[14] *Belton v. State*, 270 Ga. 671, 673 (3) (512 SE2d 614) (1999) (citations and punctuation omitted); see *Dewberry v. State*, 271 Ga. 624, 625 (2) (523 SE2d 26) (1999) (stating that whether an attorney's trial tactics are reasonable is a question of law, not fact).

[15] See Court of Appeals Rule 25 (b) (1) (stating that appellee's brief "shall point out any material inaccuracy or incompleteness of appellant's statement of facts and any additional statement of facts deemed necessary, plus such additional parts of the record or transcript deemed material"). See generally *Ruffin v. State*, 283 Ga. 87, 91 (12) (d) (656 SE2d 140) (2008) (noting principle that trial counsel's performance cannot be deemed deficient for failing to locate defense witness whose existence was not brought to counsel's attention); *Escobar v. State*, 279 Ga. 727, 730 (5) (620 SE2d 812) (2005) (holding that trial counsel's performance was not deficient for failing to discover a possible defense witness of whom he was not informed).

lawyer on notice that those particular individuals could have provided helpful testimony about V. H.'s veracity during prior years.

Wofford's trial lawyer explained at the new trial hearing how he sought to discredit V. H., as well as O. H. The tactics he employed, as the trial transcript amply supports, included emphasizing the inconsistencies amongst the girls' outcries and their trial testimony, showing that one outcry witness (the school counselor) had concerns about V. H.'s truthfulness in her allegations about Wofford, and pointing out that the school psychologist testified that V. H. had a "very active fantasy world," tended to overreact to minor disappointments, lacked adequate coping mechanisms, and resorted to manipulating situations so as to get out of trouble. Furthermore, the record shows that Wofford's trial lawyer highlighted the girls' delayed disclosures, V. H.'s initial retraction, which was followed by her claim that the retraction was a lie, and the lack of medical evidence corroborating their allegations of sexual abuse.

Having examined trial counsel's performance under the circumstances confronting counsel at the time, and without resorting to hindsight, we conclude that the tactics employed by Wofford's trial counsel to impeach V. H. and O. H. amounted to "the exercise of reasonable professional judgment and did not fall outside the wide

range of professional conduct."[16] Inasmuch as Wofford thus failed to establish that his trial counsel's performance was deficient, the trial court erred in concluding that Wofford had carried his burden of proving ineffective assistance of counsel.[17]

(b) *Prejudice Prong.* As to this prong, the trial court stated in its order, "[T]his Court cannot say [the two teachers'] testimony would probably have little or no impact on the jury's consideration of the case." But

> [t]he *Strickland* Court set forth the *appropriate* test for determining prejudice: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[16] *Martin v. State*, 281 Ga. 778, 780 (3) (b) (642 SE2d 837) (2007) (citation and punctuation omitted); see *Washington*, supra (rejecting claim that trial counsel was ineffective in manner of impeaching a witness, noting that "[w]hile not impeached . . . in the way appellate counsel would have liked, the witness was impeached on the subject"); *Pickard*, supra (trial counsel's failure to call victims' mother as a witness based on her having told trial counsel prior to trial that she had sought counseling for her daughters' "lack of truthfulness," did not show ineffectiveness, where trial counsel testified that he decided to impeach victims' credibility by pointing out inconsistencies in their allegations and their conduct); *Robbins v. State*, 290 Ga. App. 323, 332 (4) (e) (659 SE2d 628) (2008) (rejecting claim that trial counsel was ineffective for failing to defend case by calling child victim to the stand, where defense advanced theory that child had come to the conclusion that she had contact with defendant's "private" because her mother had told her so, where defense counsel sought to show that the mother was a liar); accord *Belton*, supra (finding that what the evidence would have shown was not relevant to the question of whether defense counsel performed deficiently in not pursuing the evidence).

[17] See *Martin*, supra at 782 (2); *Conaway*, supra.

20

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[18]

We need not address this prong, however. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, it is not incumbent upon the reviewing court to examine the other prong."[19]

2. Wofford has filed amended briefs in which he alleges that pretrial defects and trial errors warrant dismissal of all charges. But having failed to file any post-conviction notice of appeal (or cross-appeal[20]), Wofford has failed to bring any such issues within the purview of this appeal.[21]

*Judgment reversed. Ellington, C. J., and Dillard, J., concur.*

---

[18] *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009) (emphasis supplied), quoting *Strickland*, supra at 694 (III) (B).

[19] *Battles v. State*, 290 Ga. 226, 229 (2) (719 SE2d 423) (2011) (citation omitted).

[20] See OCGA § OCGA 5-7- 1 (b) (providing that in any instance in which any appeal is taken by and on behalf of the State of Georgia in a criminal case, the defendant shall have the right to cross-appeal).

[21] See *State v. Pye*, 282 Ga. 796, 803, n. 11 (653 SE2d 450) (2007) (explaining in an appeal by the state that, although the defendant's brief included a purported enumeration of error and was denominated "Response Brief and Cross-Appeal of Appellee," because no cross-appeal had been docketed in appellate court, and no notice of cross-appeal had been filed, the purported enumeration of error could not be considered).