NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: July 5, 2023

S23A0637.  WOOD v. THE STATE

COLVIN, Justice.

Appellant Bobby Wood, Jr., was convicted of felony murder in connection with the March 2020 shooting death of Aaron Skinner.[1] On appeal, Appellant contends that (1) the trial court abused its discretion in denying him the opportunity to cross-examine the

---

[1] Skinner died on March 30, 2020.  On November 6, 2020, a Baldwin County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault (Count 3).  On April 16, 2021, Appellant moved for immunity from prosecution based on self-defense under OCGA § 16-3-24.2.  After a hearing, the trial court denied the immunity motion.  At a jury trial held May 10 to 12, 2021, the jury found Appellant not guilty of malice murder but guilty of felony murder and aggravated assault.  The trial court sentenced Appellant to life in prison with the possibility of parole for the felony murder count and merged the underlying aggravated assault count into the felony murder conviction for sentencing purposes. Appellant's trial counsel timely filed a motion for new trial on May 14, 2021, which was subsequently amended through new counsel on September 14, 2022.  After a hearing, the trial court denied the amended motion on September 29, 2022.  Appellant filed a timely notice of appeal.  The case was docketed to this Court's April 2023 term, and oral argument was held on May 18, 2023.

State's expert witness about Skinner's alleged arrest for criminal trespass on the day before the shooting; (2) the trial court violated his right to due process by denying him access to certain physical evidence post-trial; (3) trial counsel was ineffective for failing to object to the State's redirect examination of the State's expert witness as outside the scope of redirect examination; and (4) the cumulative effect of the alleged errors committed by the trial court and trial counsel deprived Appellant of a fair trial. For the reasons set forth below, we affirm.

1. The evidence at trial showed the following.[2] Around 9:00 p.m. on March 30, 2020, officers with the Baldwin County Sheriff's Office were dispatched to Fox Hill Road after a 911 caller reported

---

[2] Because this case involves questions of harmless error and prejudice under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), the trial evidence is described in some detail rather than only in the light most favorable to the jury's verdicts. See *Ash v. State*, 312 Ga. 771, 772 (1) n.2 (865 SE2d 150) (2021) (noting that when assessing whether a trial-court error was harmless, "we review the evidence de novo and weigh it as a reasonable juror would, rather than reviewing it in a light most favorable to upholding the jury's verdicts of guilty" (citation and punctuation omitted)). See also *Draughn v. State*, 311 Ga. 378, 382-383 (2) (b) (858 SE2d 8) (2021) ("To determine whether [a defendant] has shown *Strickland* prejudice, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." (citation and punctuation omitted)).

seeing "a suspicious person." As an officer was en route to the area, officers received a second 911 call from Appellant reporting that "a man was shot" on Fox Hill Road. In response to the 911 operator's questions, Appellant revealed that he "shot [the man] . . . with a rifle." Appellant further stated that the man, who he identified as his sister's ex-boyfriend, was "coming at [him]" and "pointing a gun at [him] or something and talking real crazy."

Upon arriving on the scene, officers found the man "lying on the ground . . . [i]n the middle of the road" with a "[g]unshot wound to the lower stomach area." There were no weapons on or near his body. Officers were able to identify the man as Skinner based on his photo in the jail database system. Appellant was still at the scene and, when asked, immediately identified himself as the shooter, explaining that Skinner "came at [him], pointing something." Upon request, Appellant led the officers to his car, where he had placed the firearm used to shoot Skinner, which was an AK 7.62 x 39 firearm with "two magazines that were taped together."

Appellant waived his *Miranda* rights[3] and consented to be interviewed by Detective Michael Burrell on the scene. Appellant informed Detective Burrell that his sister, Sheila Wood ("Sheila"), had dated Skinner over a year ago and that he "met [Skinner] a few times and didn't like him." According to Appellant, Sheila and Skinner had not had any contact in the past year, until Skinner showed up at Sheila's house around midnight on the night before the shooting. Appellant had been visiting Sheila at the time, but did not speak with Skinner. Appellant further stated that, right before the shooting, he was inside his house when he received a Facebook message from his neighbor, Jessica Driggers, informing him that Skinner was "geeked out" and Skinner was on his way to Appellant's house. Appellant went to his car, which was parked next to his house, to grab his firearm and other belongings because, according to Appellant, Skinner was a "thief," and had stolen pistols from him and Sheila in the past. Appellant then heard his roommate, Keith Blizard, who was driving away from Appellant's house but still

---

[3] *Miranda v. Arizona,* 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

within earshot, tell someone "to leave," and Appellant saw Skinner walking on the road toward his house. Appellant told Skinner to "stop" and fired three warning shots from inside his fenced-in yard. Appellant explained that he fired these warning shots at a ditch near where Skinner was standing, which was between his three-foot, barbed-wire fence and the roadway, and that Skinner continued to "come at [him]" while "talking out of his head." Appellant stated that he fired one more shot in Skinner's direction, saw "sparks like [the bullet] hit the road," and heard Skinner "holler." Appellant explained that he thought Skinner left the area after the fourth shot, so he went inside his house to retrieve his phone and a flashlight and then got into his car because he was "fixing to see where [Skinner] went." Appellant then saw Skinner lying in the road and called 911. Throughout the interview, which was recorded on the body camera of one of the responding officers, Appellant maintained that he "thought [he] was in danger of [Skinner] hurting him" but that he was unsure whether Skinner was actually pointing a gun because "it was dark." Appellant also

5

showed Detective Burrell where he was standing in relation to the ditch and Skinner, and Detective Burrell confirmed with Appellant that Skinner never entered his driveway or yard.

On the morning after the shooting, officers went back to investigate the scene, which was left unsecured overnight. Officers observed three bullet strikes in the ditch area. Officers also observed four additional bullet strikes outside of the ditch and in the road and general area. Further, the officers found in the general area a total of seven shell casings and were able to recover two bullets. Although the State's ballistic expert testified that the shell casings visually "matched the bullets that were in the magazines" seized from Appellant, no further ballistic testing was performed.

A search of Appellant's cell phone confirmed his statement that he had received a Facebook message from Driggers right before the shooting. Appellant's cell phone further revealed that he had the following conversation with Sheila on Facebook Messenger at 9:12 p.m. on the night of the shooting:

APPELLANT: I shot Aaron so go on to sleep

6

SHEILA: Seriously?  I saw him walking up 49 today and [J]essica just said that he keeps coming by there.[4]

APPELLANT: Seriously

SHEILA: Is he dead? [J]essica told me his dumb a** was headed to you.  He must have been tweaking bad

SHEILA: She said he going on about me.  I haven't talked to him in over a year till he popped up.  I heard cops hauled him off from his mama's yesterday [so] he must've come this way?

APPELLANT:  Well [K]eith told [him] he better leave and he was talking crazy I told him he better get up road and he started at me pointing something  I shot he hit ground started hollering he loved me I didn't know if it was a gun or what so I shot

Appellant's cell phone records further revealed that he had called 911 at 9:22 p.m., approximately ten minutes after he first messaged Sheila.

Detective Burrell interviewed Appellant two additional times, both of which were video-recorded. Throughout the interviews, Appellant maintained that he "didn't know if [Skinner] had a gun or not so [he] shot him," and he stated that he had heard from Sheila

---

[4] Sheila then sent Appellant a "thumbs up" icon.

that Skinner was recently in jail. When Detective Burrell revealed to Appellant that officers found a total of seven shell casings, Appellant responded that he thought he had only fired four shots. Detective Burrell also asked Appellant why it had taken him ten minutes to call 911 after messaging Sheila. Appellant responded that he was trying to find a flashlight. During the final interview, Detective Burrell asked Appellant if he had fired a few shots before he saw Skinner raise his hand and point in Appellant's direction, and Appellant responded, "Yeah."

At trial, the jury viewed video recordings of Appellant's three interviews and body camera footage of the officers who first arrived on the scene. Detective Burrell testified that his investigation revealed that Skinner had never entered Appellant's property; that Appellant began shooting toward Skinner from behind his fence before he saw Skinner raise his hand and point something at Appellant; that, when asked if Appellant knew what Skinner was pointing, Appellant stated that he "d[id]n't have a clue, it was dark"; and that Appellant never stated during his interviews that Skinner

8

verbally threatened him.

The State's ballistic expert, Major Joseph Bradley King, testified that, based on the "cluster of shell casings" found, the shooter fired a total of seven shots from a stationary position. He further opined that the fatal bullet ricocheted off the roadway before hitting Skinner and that it was unlikely that Skinner "would have traveled far [after being hit with the bullet] because he was injured pretty bad," indicating that Skinner had been moving away from the ditch and back toward the road when he was shot. On cross-examination, Major King was asked about his decision to leave the crime scene unsecured on the night of the shooting and whether it was possible that someone tampered with the evidence. Major King maintained that it was "unlikely" and that he "[stood] by [his] decision" to leave the scene unsecured.

The State called Blizard, Sheila, and Driggers as witnesses. Blizard testified that, shortly before the shooting, he saw Skinner walking down the road toward Appellant's house. According to Blizard, Skinner looked like "something was wrong with him," and

Blizard could "tell he was messed up on something." Blizard testified that he told Skinner to go back the other way because he "kn[e]w through [Appellant]" that Skinner was "a thief."

Sheila testified that Skinner came to her house around midnight on March 29, that he appeared to be intoxicated, and that he left after she asked him to leave. Sheila also testified that she saw Skinner again at 4:00 p.m. on the day of the shooting. Skinner was walking down the highway and again appeared to be intoxicated. Sheila further testified that Skinner was "sweet" and "[v]ery attentive" when he was sober. But she said that, when he was intoxicated, "[h]e was very abusive verbally, sometimes physically abusive," and that, "if he had been up for a few days, he tended to be more violent." Sheila also stated that, while she and Skinner were dating, she believed Skinner may have stolen Appellant's gun out of his truck.

Driggers testified that Skinner knocked on her door shortly before 9:00 on the night of the shooting and was "just babbling incoherently." Driggers further testified that she had seen him "a

10

little high before," but that "this time [she] felt like he was really out there on something." Driggers also stated that Skinner had not threatened her but made her feel "uneasy" and that Skinner did not appear to have any weapons but "did have a lot of things in his hands."

Additionally, the State called as witnesses two people who were driving down Fox Hill Road immediately after the shooting. They testified that Appellant had appeared calm and did not seem to be too "tor[n] up" about what had happened.

A medical examiner testified that the bullet retrieved from Skinner during his autopsy entered at an upward angle and that the gunshot wound was "rapidly fatal." The medical examiner also testified that Skinner had methamphetamine, amphetamines, and marijuana in his system when he died.

The defense introduced as its sole witness a toxicology expert. She testified that, prior to Skinner's death, he had "very recently" used methamphetamine. However, she opined that Skinner "wasn't in a binging situation" and had likely used methamphetamine at

11

"one setting . . . and then did not use any more."

2. Appellant first contends that the trial court abused its discretion in denying him the opportunity to cross-examine Major King about Skinner's prior arrest for criminal trespass. Appellant's claim fails.

Before trial, the State moved in limine "to prevent the defendant from blatantly attacking the victim's character." Specifically, the State sought to exclude evidence that, on the day before the shooting, Skinner and his mother had an altercation and Skinner was arrested for criminal trespass. The trial court ruled that, because Appellant did not know about Skinner's arrest when the shooting occurred, the arrest was irrelevant and inadmissible.

During trial, Appellant twice moved the trial court to reverse its previous ruling excluding Skinner's arrest. First, Appellant asked the court to revisit its earlier ruling after the jury viewed video footage from the body cameras of Officers Kevin Veal and Ashley Brown. The body camera footage showed the officers identify Skinner based on his photo in the jail database system and discuss

12

that Skinner was "in the jail recently" and had been "locked up for criminal trespass," and Appellant argued that the State had "opened the door" to the arrest. The State objected, noting that the prosecutor had stopped playing Officer Brown's body camera footage before Skinner's arrest was mentioned but that defense counsel had requested that the entire footage be played for the jury. The trial court denied Appellant's request. Appellant again asked the court to reconsider its prior ruling after the following exchange occurred during the State's redirect examination of Major King:

> STATE: This jury this week has heard what an awful person Aaron Skinner is or was. During the course of your investigation, your team's investigation, did you look at Aaron Skinner's criminal history?
>
> MAJOR KING: Yes, sir.
>
> STATE: How many burglary convictions did Aaron Skinner have?
>
> MAJOR KING: None.
>
> STATE: How many theft by taking convictions did Aaron Skinner have?
>
> MAJOR KING: None.

STATE: How many felony convictions did Aaron Skinner have?

MAJOR KING: None.

STATE: How many battery convictions did Aaron Skinner have?

MAJOR KING: None.

STATE: How many simple assault convictions did Aaron Skinner have?

MAJOR KING: None.

The trial court again denied the motion, explaining that the prosecutor's questioning of Major King was in rebuttal to defense counsel referring to Skinner as a "thief," which he had done ten times during opening statements,[5] and that Appellant was entitled to show Skinner's character only by reputation or opinion evidence.

Appellant argues that the trial court abused its discretion in preventing him from cross-examining Major King about Skinner's

---

[5] Defense counsel also referred to Skinner as "violent" nine times. For example, defense counsel stated that the jury would hear evidence that Skinner, "[who was a] thief[,] who was high, who was violent, who had been told to leave twice, and who had just heard three warning shots into a ditch kept coming at [Appellant]."

14

arrest pursuant to OCGA § 24-4-405 (c) ("Rule 405 (c)").  Rule 405

(c) provides an exception to the rule that character evidence

generally must be introduced through reputation or opinion

testimony, see OCGA § 24-4-405 (a), allowing a party to inquire "into

relevant specific instances of conduct" on cross-examination of a

character witness in order to discredit the witness.  See *Leanos v.*

*State*, 303 Ga. 666, 672 (2) (c) (iii) (814 SE2d 332) (2018) (explaining

that Rule 405 (c) allows a party to cross-examine a character witness

about specific instances of conduct "in an attempt to undermine the

witness's credibility").  See also *United States v. Seymour*, 468 F3d

378, 387 (II) (C) (6th Cir. 2006) (explaining that, under Federal Rule

of Evidence 405, "inquiry into relevant specific instances of conduct

on cross-examination is allowed only where it goes to the accuracy

of the character witness's testimony") (citation and punctuation

omitted).[6]  According to Appellant, Major King's testimony showed

---

[6] "Many provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when we consider the meaning of these provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States

15

that Skinner was a "law-abiding citizen" and, thus, Appellant had the right on cross-examination to inquire into specific instances of Skinner's conduct, such as his arrest, so that the jury heard "balanced" rather than "exclusively positive" evidence of Skinner's criminal history.

However, even assuming that the trial court abused its discretion in preventing Appellant from cross-examining Major King about Skinner's arrest, any error was harmless. "The test for determining whether a non-constitutional evidentiary error was harmless is whether it is highly probable that the error did not contribute to the verdict." *Talley v. State*, 314 Ga. 153, 160-161 (2) (875 SE2d 789) (2022). When reviewing an evidentiary error for harmlessness, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." Id. at 160-161 (2) (citation and punctuation omitted).

Here, even assuming the jury heard "exclusively positive"

Supreme Court and the Eleventh Circuit." *Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

evidence about Skinner's criminal record, it is highly probable that any error in preventing Appellant from cross-examining Major King about Skinner's arrest did not contribute to the verdict because the evidence against Appellant's self-defense claim was strong. The jury heard testimony from the State's ballistics expert that Skinner was on the opposite side of Appellant's three-foot, barbed-wire fence when he was shot and that Skinner had never entered Appellant's property. Moreover, the jury heard Appellant's own assertions that he began firing at Skinner before Skinner appeared to raise his hand and point something at Appellant and that he was unsure whether Skinner had a gun that night. Further, the jury heard testimony from Driggers, who had encountered Skinner right before the shooting, that Skinner was clearly under the influence but not otherwise threatening. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) (concluding that evidentiary error was harmless "in light of the array of other strong evidence demonstrating Appellant's guilt").

3. Appellant next claims that the trial court violated his right

17

to due process by denying his motion to permit a ballistics expert retained after trial to access certain physical evidence for purposes of developing an ineffective-assistance-of-counsel claim in his motion for new trial. Appellant argues that the trial court's denial of access hindered his right to appeal and deprived him of his right to due process of law. We are unpersuaded.

After trial, Appellant retained a ballistics expert in an effort to determine whether trial counsel was ineffective for failing to present such an expert at trial. Appellant then moved the court to permit the ballistics expert to access the AK 7.62 x 39 firearm seized from Appellant at the time of his arrest, the magazines and cartridge cases obtained at the scene, and the bullets recovered at the scene and from Skinner's body.

The trial court held a status hearing on the motion, after which Appellant provided an affidavit from his expert, as well as a letter in which he claimed that an inspection and examination of the requested evidence could determine whether Skinner was retreating from or approaching Appellant's property when he was shot.

18

According to Appellant, if an examination revealed that the bullet that hit Skinner had ricocheted off the ditch, rather than the road, it would discredit the State's argument that Appellant was not justified in shooting Skinner in self-defense because Skinner was retreating from Appellant's property. The trial court summarily denied Appellant's motion to access the evidentiary materials and proceeded with the hearing on the motion for new trial. At the hearing, Appellant renewed his earlier motion, which the trial court again denied.

To establish an ineffective-assistance-of-counsel claim, a defendant must show "a reasonable probability that, but for his lawyer's unprofessional errors, the result of the proceeding would have been different." *Mattox v. State*, 308 Ga. 302, 304 (2) (840 SE2d 373) (2020). Accordingly, a trial court does not abuse its discretion in denying a motion to allow an expert retained post-trial to examine and test the physical evidence admitted at trial for purposes of developing an ineffective-assistance-of-counsel claim absent a showing that "favorable testing results" would reveal "that the

19

outcome of trial would have been different had trial counsel pursued such testing." *Battles v. State*, 290 Ga. 226, 230-231 (3) (719 SE2d 423) (2011) (concluding that "the trial court properly denied appellant's request to re-test the scientific evidence" because appellant failed to demonstrate "how any favorable testing results may have affected the result at trial").

Here, Appellant has failed to make the required showing. Appellant's hypothesis that an expert may be able to investigate the evidence and determine that the fatal shot ricocheted off the ditch, rather than the road, would be contrary to Appellant's own statements that, after he fired toward Skinner, he "saw sparks come off [the] pavement," "like [the bullet] hit the road," and heard Skinner "holler." See *Humphrey v. Nance*, 293 Ga. 189, 222 (3) (c) (ii) (744 SE2d 706) (2013) (trial counsel's failure to introduce an expert witness who would testify that the defendant had no knowledge of firing the gun did not prejudice the defendant where "there [was] no reasonable probability that the jury would have found persuasive his testimony," given the defendant's own

20

statements to law enforcement officers acknowledging that he fired the gun). Moreover, the evidence presented, which included a video of Skinner lying in the road and a presentation of the bullet defects found in the road, was consistent with the testimony of the State's ballistics expert that the shot that killed Skinner "absolutely" ricocheted first off the road. See *Robinson v. State*, 277 Ga. 75, 77 (2) (586 SE2d 313) (2003) (concluding that the defendant could not show a reasonable likelihood that, but for his trial counsel's failure to retain an expert, the outcome of his trial would have been different, given that the evidence presented at trial was consistent with the testimony of the State's medical examiner). Further, Appellant has failed to demonstrate that, even if he presented evidence that the fatal shot had ricocheted off the ditch rather than the road, there is a reasonable probability that the outcome of his trial would have been different. The jury was authorized to reject Appellant's claim that he shot Skinner in self-defense, given that Appellant was shooting at Skinner from the opposite side of his fenced-in yard, that Skinner never entered his property, and that he

21

was unsure whether Skinner had a gun that night. See *Davis v. State*, 312 Ga. 870, 873 (1) (855 SE2d 390) (2021) (jury authorized to reject self-defense claim in part because the defendant "admitted that he did not see [the victim] pull a gun during the incident"). Accordingly, Appellant's claim fails.[7]

4. Appellant also argues that he received constitutionally ineffective assistance of counsel because defense counsel failed to object to the State's questioning of Major King on redirect examination about Skinner's lack of criminal convictions. According to Appellant, the redirect examination was improper because Major King had not testified on cross-examination about Skinner's record.

To succeed on a claim of ineffective assistance of counsel, a defendant must show both "that his counsel's performance was professionally deficient and that he suffered prejudice as a result."

---

[7] Appellant also cites *Sheard v. State*, 300 Ga. 117 (793 SE2d 386) (2016), for the proposition that the denial of access to physical trial evidence violated his due process rights. Appellant's reliance on that case is misplaced. In *Sheard*, we held that a defendant is entitled to have a trial transcript that allows for "adequate appellate review of the trial below" id. at 120 (2), not that a defendant is entitled to have trial exhibits made available for inspection post-trial.

*Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). To prevail on the deficiency prong, the defendant "must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances in light of the prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (2) (787 SE2d 221) (2016). "To prove prejudice, [the defendant] must demonstrate that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Washington*, 313 Ga. at 773 (3). "Failure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong." *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015) (citation and punctuation omitted).

Here, even assuming deficient performance, Appellant has not shown that Major King's testimony about Skinner's lack of criminal convictions prejudiced his defense. As we explained in Division 2, the evidence against Appellant's self-defense claim was strong,

23

irrespective of whether the jury heard "exclusively positive" evidence about Skinner's criminal history. The jury heard evidence that Skinner was on the opposite side of Appellant's barbed-wire fence when he was shot and never entered his property and heard Appellant's interview statements that he was unsure whether Skinner had a gun that night and that Appellant fired toward Skinner before Skinner raised his hand and pointed in Appellant's direction. Given that the evidence against Appellant was strong, Appellant has not shown a reasonable probability that, but for counsel's alleged deficiency, the result of the trial would have been different. See *Bell v. State*, 294 Ga. 443, 446 (2) (754 SE2d 327) (2014) (concluding that any deficiency in trial counsel's failure to object to the prosecutor's questioning of a witness did not result in prejudice "[g]iven the substantial evidence of [the defendant's] guilt"). Accordingly, this claim fails.

5. Appellant lastly contends that the cumulative effect of the trial court's assumed error in preventing Appellant from cross-examining Major King about Skinner's arrest and trial counsel's

24

assumed deficiency in failing to object to the State's redirect examination of Major King about Skinner's lack of criminal convictions denied him a fair trial.[8] We disagree.

To establish cumulative error, a defendant must demonstrate that "at least two errors were committed in the course of the trial" and "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (citation and punctuation omitted). When considering the "cumulative effect of presumed errors by trial counsel and the trial court," this Court "consider[s] collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." *Patterson v. State*, 314 Ga. 167, 181 (5) (875 SE2d 771) (2022) (citation and punctuation omitted).

---

[8] Appellant does not argue that the trial court's alleged error in denying his expert access to certain physical evidence contributed to cumulative prejudice. However, this makes no difference in the cumulative-error analysis because we concluded that no error occurred. See Division 3, supra.

Appellant's claim fails. As noted above, even assuming the jury heard "exclusively positive" evidence of Skinner's criminal history, the trial evidence rebutting Appellant's self-defense claim was strong, particularly in light of Appellant's own statements that he fired at Skinner before Skinner raised his hand, that he did not know if Skinner had a gun that night, and that Skinner never entered his property. Accordingly, Appellant has not demonstrated that the prejudicial effect of the assumed trial-court error and assumed deficient performance denied him a fundamentally fair trial. See *Huff v. State*, 315 Ga. 558, 568 (6) (883 SE2d 773) (2023) ("Appellant's [cumulative-error] claim fails because Appellant has not demonstrated that the prejudicial effect of the assumed trial-court errors and ineffective assistance denied him a fundamentally fair trial, given the strong evidence against him.").

*Judgment affirmed. All the Justices concur.*