307 Ga. 263
FINAL COPY

S19A0936. SMITH v. THE STATE.
S19A0937. JACKSON v. THE STATE.

BETHEL, Justice.

Rodney Tyrone Smith and Javon Tyler Jackson appeal from

the denial of their motions for new trial after a jury found them

guilty of malice murder and other crimes in connection with the

shooting death of Stephanie Smith and the shooting of Rasheeda

Bostic.[1] Both Smith and Jackson claim that the State presented

---

[1] The crimes occurred on August 20, 2016. Smith and Jackson were indicted jointly by a Chatham County grand jury on February 22, 2017, for malice murder, felony murder predicated on aggravated assault, aggravated assault of Stephanie Smith, and aggravated assault of Rasheeda Bostic. Jackson was also indicted individually for possession of a firearm by a convicted felon and felony murder predicated on that offense. At a joint jury trial held in October 2017, Smith and Jackson were each found guilty on all counts with which they were charged. Jackson was sentenced to serve life in prison for malice murder, a term of 20 years for the aggravated assault of Bostic, and a term of five years for possession of a firearm by a convicted felon (to run concurrently with each other but consecutively to the life sentence). Smith was sentenced to serve life in prison for malice murder and a consecutive term of 20 years for the aggravated assault of Bostic. As to both Smith and Jackson, the convictions for the felony murder of Stephanie Smith were vacated by operation of law, and the conviction for the aggravated assault of Stephanie Smith merged with the malice murder conviction.

Smith filed a motion for new trial on October 27, 2017, which he amended

insufficient evidence to support the jury's verdicts, that the trial court erred in admitting recordings of two witnesses' prior statements, and that their trial attorneys provided ineffective assistance. Finding no reversible error, we affirm.

1. *Evidence Presented at Trial.*

Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On August 20, 2016, around 8:00 p.m., Ebony Washington, Stephanie Smith, Rasheeda Bostic, and Theresa Goldwire were riding together in Savannah in Washington's vehicle, a black SUV. Washington drove the car, Stephanie Smith sat in the front passenger seat, Bostic sat behind Stephanie Smith, and Goldwire sat behind Washington. As Washington drove the car down Jefferson Street past 35th Street, she was having a heated conversation on the phone.

---

through new counsel on June 8, 2018. Jackson filed a motion for new trial on October 27, 2017, which he amended through new counsel on May 23, 2018. On June 12, 2018, the trial court held a joint hearing on the motions. On January 30, 2019, the trial court denied Smith's and Jackson's amended motions for new trial in separate orders. Smith and Jackson each filed notices of appeal on February 11, 2019, and these cases were docketed to the Court's April 2019 term. Smith's case was submitted for a decision on the briefs, and Jackson's case was orally argued on June 18, 2019.

Suddenly, as the vehicle neared the intersection of Jefferson Street and 32nd Street, multiple gunshots were fired at the car. Bostic had been looking down at her phone when the shots began and was unable to identify the shooter. However, Bostic recalled seeing two men running and shooting at the car as Washington attempted to drive away, and she testified that she was sure more than one person had fired at the car. When an officer arrived at the scene, Bostic told the officer, "he shot me on 32nd Street." Goldwire did not see the shooters because she was using a tablet and then got onto the floor of the car when the shooting began.

The car came to a stop in the middle of the street at the intersection of Victory Drive and Barnard Street, several blocks from where the shooting began. Goldwire then called 911.

The car's entire rear window was shot out. Stephanie Smith suffered a gunshot wound to the back of her head and slumped over in the front passenger seat. Bostic suffered a gunshot wound to her back, which broke three of her ribs. Bostic survived her injuries, but Stephanie Smith died four days later. The medical examiner

testified that Stephanie Smith's death was caused by a single gunshot wound to the head and that the manner of death was homicide.

Officers were dispatched to the intersection of Jefferson Street and 31st Street based on ShotSpotter technology that had been deployed in that area. ShotSpotter operates through a series of microphones that alert law enforcement to the presence of gunshots and triangulate the location of the shots, allowing police to respond even in the absence of a 911 call. ShotSpotter detected gunshots at the intersection at approximately 8:07 p.m. on August 20, 2016. Upon arrival at the scene, law enforcement officers recovered 29 nine-millimeter shell casings from the intersection.

At 2:25 the next morning, law enforcement officers obtained a search warrant for a residence located at 302 West 32nd Street, which was part of a duplex on the corner of 32nd Street and Jefferson Street. Deonshae Campbell and Dionysha Hearns, who are sisters, resided at the home with their mother. While searching the home around 3:30 a.m., officers found a plastic bag with two nine-

4

millimeter semi-automatic handguns: a Ruger P95 and a Glock 17. The bag containing the guns was submerged in a toilet tank. The guns were covered in a white, chalky substance law enforcement believed to be laundry detergent, as its smell and consistency matched that of laundry detergent found elsewhere in the house. The presence of this substance rendered the guns inoperable at that time. However, a GBI firearms expert was able to remove the white substance from both firearms, perform test shots, and compare the two firearms with the 29 nine-millimeter shell casings recovered from the intersection where the shootings occurred. Nine of the recovered shell casings were matched to the Ruger, and the remaining 20 were matched to the Glock.

Campbell and Hearns grew up with Jackson, whom they knew as "Tyler," "Light Bright," and "Bright Eyes," and Smith, whom they knew as "NaNa" and "Slim." Smith and Jackson are brothers. At the time of the shootings, Smith lived around the corner from Campbell and Hearns on 33rd Street. In the weeks following the shooting, Campbell and Hearns were both questioned by police. They told

police that Smith and Jackson ran into their home after the shooting, each carrying a gun, and both Campbell and Hearns identified Smith and Jackson in photographic lineups as those individuals.

Campbell and Hearns were both subpoenaed as witnesses by the State, but they initially refused to appear at trial. The trial court issued warrants for their arrest, and they were brought to court by their mother and grandmother.

Early in Campbell's appearance at trial, she testified that both Smith and Jackson ran into the house at 302 West 32nd Street after the shooting. However, she quickly became uncooperative during the State's examination of her, at one point pulling the hood of her sweatshirt over her head while being questioned about her previous identification of Smith and Jackson in photographic lineups presented to her by law enforcement.[2] The trial court then

---

[2] Campbell continued to be uncooperative during other parts of her testimony and was asked by the trial court, the prosecutor, and Jackson's counsel to uncover her face so that the jury could see her. The record reflects that Campbell repeatedly refused to look at the questioning attorney and that

6

authorized the State to treat Campbell as a hostile witness. When the prosecutor asked Campbell if she had given any statements to law enforcement after the shootings, she replied that she did. The prosecutor then asked, "Think it might refresh your recollection to see a video recording?" Campbell replied, "I smoked too much weed to remember anything." Over the objection of both Smith and Jackson,[3] the State then played several portions of a video recording of Campbell's interview with law enforcement. In that interview, Campbell told the detectives that she was in the house when the shooting began. She initially stated that she did not know the two men that were on the street corner when the shooting occurred but that they were "out there every day." Campbell stated that when she saw the men on the corner, they were "sometimes" smoking marijuana and that they "might be" selling it, though she had never seen them sell.

---

she was told several times to raise her head and speak up so that the court reporter and the jury could hear what she was saying.

[3] The record reflects that the objection made by Smith and Jackson at that time was limited to an objection under OCGA § 24-4-404 that the recording included improper character evidence.

In her interview, Campbell said that when the shooting began, she ran to the door, and, at that time, several people ran into the house, including two men whom she did not know. The men had guns in their hands. Campbell stated that she believed the two men were the shooters because they were "the only dudes on the corner" and that Smith "live[d] around the corner" in a house on 33rd Street. She later stated that one of the men had been hanging out on that corner for "months" selling crack. In the recorded interview with the detectives, Campbell became emotional and began crying. She asked for her grandmother, who was outside the room. Her grandmother and the detectives encouraged Campbell to identify the two men. After this discussion, Campbell identified the two men who ran into the house as brothers named "Tyler Jackson" and "Rodney Smith" (whom she also identified as "Rodney Jackson" and "NaNa"). She told the detectives that she could identify Smith and Jackson in photographs. She also added that when Smith and Jackson ran into the house, she ran out but that they locked Hearns (her sister) in the house with them.

8

After the video concluded, Campbell resumed her trial testimony. In that testimony, she stated that she saw Smith on the street corner after the shooting occurred.

Hearns was also called to testify at trial. She refused to identify Smith and Jackson by their given names, and the trial court declared her a hostile witness. Her testimony continued, but she claimed not to recall seeing anything outside the house at 302 West 32nd Street when the shooting occurred. Like Campbell, Hearns gave an interview to law enforcement that was video recorded. When Hearns could not recall seeing anything outside the house, the prosecutor said, "I'd like to refresh the witness's recollection at this time, Judge, with her video statement to the police." At the trial court's direction, the State proceeded to play for the jury the interview Hearns gave to law enforcement. Neither Smith nor Jackson objected.

In her recorded interview, Hearns told the detectives that, after the shooting, several people ran into the house, including "Tyler" and "NaNa." She indicated that she could identify both of

9

them in photographs. Hearns stated that she had seen NaNa and Tyler with guns before and that they had guns in their hands when they ran in the house. She also told the detectives that "the black car started shooting at them first" and that NaNa and Tyler were shooting back at the car from the street.

Hearns stated that she knew NaNa and Tyler were the shooters at the street corner because "they already said — was plotting to do it back once they — because they — NaNa said I got a feeling they was going to come back." Hearns indicated that NaNa and Tyler were plotting about the black car returning to the neighborhood because some men had fired at them from the car three weeks before. She stated that NaNa had recently been robbed by some men and that "he robbed them back." Hearns indicated that the shooting incident outside her house was a response to NaNa's robbery. Hearns also said that NaNa had said that the person he robbed had said that when he saw NaNa he was going to kill him. NaNa also learned that he had a "hit" on him. At the conclusion of the video, Hearns resumed her live testimony and confirmed that

10

the shooting incident was the culmination of "robbery back and forth and shooting back and forth."[4] At trial, the State introduced evidence that Jackson had previously been convicted of theft by receiving stolen property, a felony offense.

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find both Smith and Jackson guilty beyond a reasonable doubt of the crimes of which they were convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)); *Cowart v. State*, 294 Ga. 333, 343 (6) (751 SE2d 399) (2013) (explaining that, in determining the sufficiency of the evidence, a reviewing court "must consider all of the evidence admitted by the

---

[4] The trial court admitted a disc containing the recordings of the interviews into evidence as State's Exhibit 3.

11

trial court, regardless of whether that evidence was admitted erroneously" (citation and punctuation omitted)).

2. *Playing of Witnesses' Prior Statements.*

Smith and Jackson argue that the trial court erred by allowing the State to play the recorded interviews given by Campbell and Hearns to police detectives. They both argue that the State improperly placed these recordings before the jury while purportedly attempting to refresh the witnesses' recollection of their prior statements to police. Jackson also argues that the State did not provide a proper foundation before playing the recordings. Finally, Smith and Jackson both argue that certain statements in the recording of Campbell's interview impermissibly placed character evidence before the jury. We address each contention in turn.

(a) As neither Smith nor Jackson objected at trial on the basis that the recordings could not be played for the jury while purportedly being used to refresh the witnesses' recollections, we review their claims only for plain error. See OCGA § 24-1-103 (d).

12

> To show plain error, [Smith and Jackson] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected [their] substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Tyner v. State*, 305 Ga. 326, 331

(4) (825 SE2d

129) (2019).

OCGA § 24-6-612 (a) ("Rule 612 (a)") provides:

> If a witness uses a writing to refresh his or her memory while testifying, an adverse party shall be entitled to have the writing produced at the hearing or trial, to inspect it, to cross-examine the witness on such writing, and to introduce in evidence those portions of such writing which relate to the testimony of the witness.

Here, pretermitting whether the trial court clearly erred by permitting the State to play these recordings for the jury while purportedly offering them to refresh the witnesses' recollection,[5] and pretermitting whether any such error was affirmatively waived,

---

[5] Because we pretermit the issue of whether the trial court erred by allowing the State to play these recordings while purportedly offering them to refresh the witnesses' recollections, we do not reach the question in this case of whether the recordings are a "writing" within the meaning of Rule 612 (a).

Smith and Jackson have not shown that their substantial rights were affected by the admission of the recordings. Given that both Campbell and Hearns testified at trial that they could not recall anything about the events surrounding the shooting that took place outside their house and made other statements that were inconsistent with what they had previously told the police, their recorded interviews were admissible as prior inconsistent statements. See *Thompson v. State*, 304 Ga. 146, 151 (6) (816 SE2d 646) (2018) (citing OCGA §§ 24-8-801 (d) (1) (A), 24-6-613 (b)). See also *Brewner v. State*, 302 Ga. 6, 17 (804 SE2d 94) (2017) ("The failure of a witness to remember making a statement may provide the foundation for offering extrinsic evidence to prove that the statement was made."). Thus, even if Smith and Jackson had objected to the playing of the recordings on the basis that Rule 612 (a) did not permit them to be played before the jury while purportedly being used to refresh the witnesses' recollection, the State could have readily moved to admit the recordings as prior inconsistent statements. Accordingly, Smith and Jackson have not

shown that the alleged error in allowing the recordings to be played by the State affected their substantial rights — i.e., that it affected the outcome of the trial. See *Davis v. State*, 306 Ga. 140, 149 (3) (h) (829 SE2d 321) (2019) (no showing of prejudice "because an objection likely would not have prevented the admission of the testimony" (citation and punctuation omitted)). This claim of plain error therefore fails.

(b) Jackson also argues that the trial court erred by permitting the recordings to be played for the jury and admitted into evidence without requiring the State to provide a foundation for such recordings. Because Jackson did not make this objection at trial, we review only for plain error.

OCGA § 24-9-901 (a) ("Rule 901 (a)") provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A party "may authenticate [a] recording by any witness familiar with the subject depicted on the recording." *State v. Smith*,

299 Ga. 901, 903 (1) (792 SE2d 677) (2016).

Here, pretermitting whether the trial court clearly erred by permitting the State to play these recordings for the jury without first requiring the State to authenticate them, and pretermitting whether any such error was affirmatively waived, Jackson has not shown that his substantial rights were affected by the admission of the recordings without such prior authentication, as there is no indication in the record that the State would have been unable to authenticate the recordings pursuant to Rule 901 (a). First, both Campbell and Hearns identify themselves by name in their respective interviews. Second, the police detective who conducted the interview with Hearns (and otherwise participated in the investigation) was called to testify at trial on behalf of the State. Thus, there is no indication that the State would have been unable to identify the recordings as being of the interviews given by Campbell and Hearns. Accordingly, "any objection based on lack of authentication could have been overcome by readily available evidence." *Brewner*, 302 Ga. at 16 (IV). Jackson has thus not carried

16

his burden of showing that the alleged error in allowing the recordings to be played by the State without authentication affected his substantial rights — i.e., that it affected the outcome of the trial. Id. This claim of plain error therefore fails.

(c) Smith and Jackson also argue that the trial court erred by allowing the State to play the recording of Campbell's interview[6] because it contained evidence that should have been excluded under OCGA § 24-4-404 (b) ("Rule 404 (b)"). Because Smith and Jackson objected to the State's use of this recording on the basis that it contained improper character evidence (namely, evidence that one or both of them had been seen on the street corner using and possibly selling drugs on several prior occasions), we review the trial court's admission of the recordings over this objection for abuse of discretion. *Nations v. State*, 303 Ga. 221, 224 (2) (811 SE2d 292) (2018).

---

[6] Neither Smith nor Jackson appears to challenge the admission of the recording of Hearns' statement on this basis. We therefore have limited our analysis to their objection to certain statements in Campbell's recorded interview.

17

Pertinent to this case, Rule 404 (b) provides as follows:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive[.] The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

At trial, counsel for Smith and Jackson argued to the trial court that the State never made any connection between the defendants' alleged prior acts of using and selling drugs on the street corner, as recounted in Campbell's interview, and the shooting incident that is the subject of this case. Over trial counsels' objection, the trial court determined that Campbell's statements were admissible pursuant to Rule 404 (b) to show Smith's and Jackson's motive in the case.

Setting aside whether such statements were admissible as evidence of motive under Rule 404 (b), the statements regarding the

18

alleged sale and use of drugs by Smith and Jackson in Campbell's recorded interview were admissible as intrinsic evidence.

> The limitations and prohibition on other acts evidence set out in OCGA § 24-4-404 (b) do not apply to intrinsic evidence. . . . Evidence is . . . intrinsic . . . when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense. . . . [E]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. . . . [E]vidence of other acts is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

(Citations and punctuation omitted.) *Williams v. State*, 302 Ga. 474, 485-486 (IV) (d) (807 SE2d 350) (2017).

Here, Campbell made a number of statements regarding drug use and possible drug sales by Smith and Jackson on the street corner outside the house where she and Hearns lived. These

19

statements explained, in part, how Campbell and Hearns knew Smith and Jackson and how they were aware of Smith's and Jackson's relationship to the vehicle they fired upon. Moreover, these statements established Campbell's and Hearns' connection to the shootings and explained, to some extent, how they were able to identify Smith and Jackson as the shooters. Campbell's statements regarding the use and possible sale of drugs by Smith and Jackson were thus inextricably intertwined with the other evidence Campbell and Hearns provided regarding the shootings.

Moreover, the State's theory of the case, as outlined in its opening statement and its closing argument, was that the shootings of Stephanie Smith and Rasheeda Bostic were the culmination of a series of drug-related robberies back and forth between defendants Smith and Jackson and persons who had been seen driving Ebony Washington's vehicle (which Hearns referred to as "the black car"). Campbell's statements that Smith and Jackson had previously been seen using and (perhaps) selling drugs on the street corner where the shooting occurred advanced this theory of the case and were

"necessary to complete the story of the crime for the jury." (Citation and punctuation omitted.) *McCammon v. State*, 306 Ga. ___, ___ (2) (___ SE2d ___) (2019). See also *Smith v. State*, 302 Ga. 717, 725-726 (808 SE2d 661) (2017) (holding that portions of the defendant's statement to the police that referred to his drug use were properly admitted as intrinsic evidence because they "formed an integral and natural part of his account of the circumstances surrounding the offenses for which he was indicted"); *Thompson*, 302 Ga. at 543 (III) (B) (evidence that defendant was a drug dealer admissible to explain context of crime "even if it incidentally places (the defendant's) character at issue."(citations and punctuation omitted)). Thus, "[b]ecause the evidence was intrinsic, it was outside the reach of Rule 404 (b)." *Clark v. State*, 306 Ga. 367, 374 (4) (829 SE2d 306) (2019).

Intrinsic evidence must also satisfy OCGA § 24-4-403 ("Rule 403"). *Williams*, 302 Ga. at 485 (IV) (d). Rule 403 provides:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The exclusion of relevant evidence under Rule 403 is an extraordinary remedy that trial courts should grant only sparingly. See *Hood v. State*, 299 Ga. 95, 102 (4) (786 SE2d 648) (2016). See also id. at 103 (4) ("The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (citation and punctuation omitted)).

Here, the State had some need for this evidence. The history of robberies and shootings back and forth between Smith, Jackson, and persons who had been seen driving the "black car" was established primarily through Hearns' recorded interview. But Campbell's recorded statements regarding the use and possible sale of drugs on the street corner by Smith and Jackson gave further context as to why this series of incidents occurred and why Smith and Jackson would have been present at the street corner and would have shot at the car when it returned to the neighborhood. See *Thompson*, 302

Ga. at 543 (III) (B). Moreover, Campbell's interview established that their acts of using and possibly selling drugs were ongoing. Campbell suggested in her interview that Smith and Jackson were "out there every day" and that one of them had been selling drugs on the corner for "months." Thus, evidence that Smith and Jackson had used and possibly sold drugs on the street corner was connected in time with the series of incidents leading up to the shootings of Stephanie Smith and Rasheeda Bostic and was "not so remote as to be lacking in evidentiary value." (Citation and punctuation omitted.) *Kirby v. State*, 304 Ga. 472, 484 (4) (a) (i) (819 SE2d 468) (2018). Thus, in light of the circumstances outlined above, although Campbell's statements incidentally placed Smith's and Jackson's character at issue, the probative value of those statements was not substantially outweighed by the danger of unfair prejudice. *Williams*, 302 Ga. at 487 (IV) (d).

Because Campbell's statements were admissible as intrinsic evidence and because the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice to Smith

23

and Jackson, the trial court did not abuse its discretion by admitting Campbell's statements. This enumeration of error therefore fails.

3. *Claims of Ineffective Assistance of Counsel.*

Smith and Jackson argue that their respective trial attorneys were ineffective for failing to make certain objections to the State's playing of the recorded statements of Hearns and Campbell. Smith also argues that he received ineffective assistance due to his trial counsel's failure to object to certain comments made by the State during opening statements. To prevail on their claims of ineffectiveness, Smith and Jackson

> [have] the burden of proving both that the performance of [their lawyers] was professionally deficient and that [they were] prejudiced as a result. To prove deficient performance, [Smith and Jackson] must show that . . . trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Smith and Jackson] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767,

24

771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

(a) Smith and Jackson first argue that they received ineffective assistance due to their attorneys' failure to object to the State's playing of the recorded interviews for the purpose of refreshing the witnesses' recollection. Smith also argues that he received ineffective assistance of counsel because his counsel did not object to the lack of foundation provided by the State prior to the recordings being played for the jury. However, for the same reasons that we concluded that Smith and Jackson could not carry their burden to show prejudice on plainerror review regarding their counsels' failure to object to the admission of the recordings on these bases, we conclude that they cannot carry their burden to show prejudice on these ineffectiveness claims. *Hampton v. State*, 302 Ga. 166, 172 (4) (b) (805 SE2d 902) (2017). Any objection to the recordings under Rule 612 (a) and Rule 901 (a) could have been readily overcome by the State, as discussed above. See *Davis,* 306 Ga. at 149 (3) (h). Thus, as there is no reasonable probability that

25

the outcome of the trial would have been different had trial counsel made these objections, these claims of ineffectiveness fail.

(b) Smith alone also argues that he received ineffective assistance due to his trial counsel's failure to object to comments made by the State during its opening statement regarding what it expected Smith's and Jackson's defense to be. Near the conclusion of the State's opening statement, the prosecutor told the jury the following:

> I suspect the defense, I can't speak for them, will be to put the whole thing on Ebony Washington and say along the lines of, we were just defending ourselves when we started this — that she started this. Which is to say to get back to the prior difficulty and we see the car and we're scared for our lives. I don't know what the argument's going to be. I suspect, in trying cases with [Jackson's trial counsel] before, that might be what you hear.

At the joint hearing on Smith's and Jackson's motions for new trial, Smith's trial counsel, an attorney with 22 years of criminal defense experience, was called to testify. In his testimony about this portion of the State's opening statement, he stated that, when the statement was made, he believed counsel for the State referred

26

specifically to Jackson's counsel because of their prior experience with one another in criminal trials. Smith's trial counsel offered no strategic reason for not objecting to this statement.

Assuming that this statement violates the rule we established in *Parker v. State*, 277 Ga. 439, 439-442 (588 SE2d 683) (2003), to the effect that "it is inappropriate for a prosecutor in a criminal case to discuss in opening statement the evidence she anticipates the defense will present at trial," id. at 441 (2), and assuming that Smith's trial counsel was deficient in failing to object to the comment, Smith has failed to show he was prejudiced. Smith's counsel testified at the hearing on the motions for new trial that he used the State's comment to later show, in closing argument, that Smith was not required to prove anything and that the burden of proof was solely with the State. Additionally, the jury was instructed as to the State's burden of proof and that opening statements are not evidence. See *Kidd v. State*, 304 Ga. 543, 545 (2) (820 SE2d 46) (2018) (holding that jury instruction that opening statements are not evidence mitigates harm from improper comment by prosecutor

27

regarding anticipated defense theory); *Jackson v. State*, 282 Ga. 494, 498 (3) (651 SE2d 702) (2007) (no prejudice arising from counsel's failure to object to State's comment on anticipated defense theory in opening statement where trial court instructed jury on the State's burden of proof and that opening statements are not evidence); *Parker*, 277 Ga. at 442 (2) (harm from improper prosecutorial comment in opening statement mitigated by jury instructions). We presume that the jury follows the trial court's instructions, see *Allen v. State*, 277 Ga. 502, 503 (3) (c) (591 SE2d 784) (2004), and Smith has not presented any evidence demonstrating that the jury did not follow the instructions given in this case. Consequently, he has failed to show that he was prejudiced by his counsel's failure to object to this statement in the State's opening statement. This claim of ineffectiveness therefore fails.

(c) Finally, we consider the cumulative effect of prejudice resulting from counsels' allegedly deficient performance. *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007) ("[I]t is the prejudice arising from counsel's errors that is constitutionally

28

relevant, not that each individual error by counsel should be considered in a vacuum." (citation and punctuation omitted)). Here, "the cumulative prejudice from any assumed deficiencies discussed in Divisions 3 [(a) and (b)] is insufficient to show a reasonable probability that the results of the proceedings would have been different in the absence of the alleged deficiencies." (Citation and punctuation omitted.) *Davis,* 306 Ga. at 150 (3) (j). We therefore find no merit in the claims of ineffective assistance raised by Smith and Jackson.

*Judgment affirmed. All the Justices concur.*

4, 2019.

Murder. Chatham Superior Court. Before Judge Abbot.

*Robert L. Persse*, for appellant (case no. S19A0936).

*David T. Lock*, for appellant (case no. S19A0937).

*Meg E. Heap, District Attorney, Jennifer L. Parker, Greg McConnell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.