**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and COOMER, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 7, 2020**

# In the Court of Appeals of Georgia

A20A1160. GRAY v. THE STATE.

MILLER, Presiding Judge.

A DeKalb County jury found Frankie Gray guilty of two counts of aggravated assault and two counts of terroristic threats. Gray appeals from the judgment, sentence, and the trial court's denial of his motion for new trial. Gray argues that (1) his trial counsel was ineffective in failing to call three witnesses who were prepared to testify that one of the victims brandished a firearm before Gray shot him in self-defense; (2) the trial court erred in failing to instruct the jury on impeachment based on a prior felony conviction; (3) the trial court erred in permitting the State to introduce evidence that the police found currency and a scale with marijuana residue inside Gray's house after the shooting; and (4) the cumulative effect of the trial

court's errors and trial counsel's ineffective assistance deprived him of a fair trial. A review of the record reveals no reversible error, and we therefore affirm.

Viewed in the light most favorable to the jury's verdicts,[1] the record shows that Dellan Lightburn and Gray lived in the same neighborhood. One day in June 2016, Dellan observed one of his friends arguing with Gray over the telephone, concerning the quality of marijuana which Gray had sold to the friend. Dellan testified that because Gray had sold him "good" marijuana on the previous day, he became involved in the argument and asked Gray to return the friend's money. Gray, however, told Dellan that the sale was none of his business. During a later telephone conversation concerning the transaction, Dellan called Gray a "snake," and Gray threatened, "Boy, I'm going to do you." Dellan then threatened to kill Gray's children.

Gray later spoke with Dellan's brother, Brandon Lightburn, and explained that he and Dellan would have to fight because they had been arguing over "somebody else['s] issue." Brandon attempted to diffuse the situation, explaining to Gray that they were adults with families and lived in the same neighborhood. Later that day, while Brandon was heading home, Gray called him and said, "[w]here he at? Where

_____

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2

he at? You better come up here. You better come up here." Brandon urged Gray to talk about the situation, but Gray again said, "come up."

Brandon drove to Gray's home, and upon entering Gray's garage, he saw Gray put a black gun behind his back in the waistband of his pants. Brandon again told Gray that they were adults and urged him to "just let it go." After learning that Brandon was at Gray's home, Dellan and his girlfriend also went to Gray's home. Upon their arrival, Gray told Dellan that they were going to fight and asked whether they would be fighting in the front or in the backyard. Gray asked Dellan whether he would put his gun down, and Dellan responded that he did not need a gun for what he was about to do. Dellan pulled up his pants in preparation for the fight and put his hands up, and Gray began shooting at him. Dellan was shot several times, including in the thumb.

When Brandon went to the ground, Gray began pacing and told him, "I might as well just shoot you in the head now; I'm going to prison." While both brothers were on the ground, Gray warned them that if they moved, he would kill them. Gray's wife exited the home and persuaded Gray to allow the brothers to leave. Gray warned them to stay on their side of the street, and Dellan and his girlfriend drove to the hospital. Later that day, Gray called Brandon and told him that he would "plead self-

defense" and state that the brothers had come to his home with a gun. A search warrant was issued for Gray's home, and the search disclosed $30 in the wall and a scale with marijuana residue.

Gray was indicted on two counts of aggravated assault (OCGA § 16-5-21) and two counts of terroristic threats (OCGA § 16-11-37 (a)). The jury found Gray guilty of all counts, and the trial court sentenced him to serve 20 years in prison. Gray filed a motion for new trial, which the trial court denied after a hearing. This timely appeal followed.

1. First, Gray argues that his trial counsel was ineffective in failing to call three witnesses who were prepared to testify that Dellan brandished a firearm before Gray shot him in self-defense. In Gray's view, his trial counsel acted deficiently in failing to call (1) Aalilah Hughes, his wife; (2) Cherreese Charleston, who was present at the home at the time of the shooting; and (3) Deante Cross-Benson, who died prior to the hearing on the motion for new trial. We determine that trial counsel did not render ineffective assistance, and this argument therefore lacks merit.

> In order to succeed on his claim of ineffective assistance, [Gray] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. To prove deficient

4

performance, [Gray] is required to show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove prejudice, [Gray] is required to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This burden is a heavy one. And if [Gray] fails to satisfy either part of the *Strickland*[2] test, we need not examine the other part. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Bell v. State*, 352 Ga. App. 802, 807-808 (2) (835 SE2d 697) (2019). "[T]he decision as to which defense witnesses to call is a matter of trial strategy and tactics, and . . . tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances." (Citations omitted.) *Hubbard v. State*, 285 Ga. 791, 794 (3) (683 SE2d 602) (2009). Further, when assessing an attorney's selection of trial tactics, "the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

---

[2] *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

5

professional assistance as even the best criminal defense attorneys would not defend a particular client in the same way." (Footnote omitted.) *State v. Wofford*, 321 Ga. App. 249, 256 (1) (a) (739 SE2d 110) (2013).

At the hearing on the motion for new trial, trial counsel explained that all three witnesses attended the trial and were available to testify. As to Aalilah Hughes, trial counsel testified that, in her first written statement, she did not indicate that she saw anyone with a gun and that she told a separate officer that "she didn't see anything." He added that Hughes also gave an audio-recorded statement in which she "g[ave] evidence to help prosecute [Gray]." Specifically, trial counsel recalled Hughes stating that Gray fled the scene, and he did not want the jury hearing such evidence from Gray's wife. Trial counsel also recalled Hughes stating to the police that if they wanted information regarding the incident, they would need to ask Gray. Thus, in trial counsel's view, Hughes gave a significant amount of information that the State could use against Gray. Trial counsel added that Hughes' subsequent "elaborate" statement "sort of impeach[ed]" her first statement, and he did not deem her a credible witness.

With regard to Cherreese Charleston, trial counsel testified that upon interviewing her about the incident, Charleston stated that Gray had told Brandon "that it was okay to come onto the property with his gun." Trial counsel believed that

such evidence would have undercut the self-defense theory and supported the State's theory that Gray had invited the brothers over to fight. He added that Charleston was present on the day of the incident, that she did not offer a statement to the police at that time, and that the fact that Charleston only gave a statement weeks later undermined her credibility. He explained, "[t]he State can easily say, well, when you had the opportunity to give a statement immediately after the incident, you didn't make one. When you had the opportunity to get . . . Mr. Gray out of this, explain it to the police early on, you didn't make a statement."

As to the third witness, Deante Cross-Benson, trial counsel testified that, as part of his statement, Cross-Benson stated that as Dellan was lying on the ground, he was apologizing to Gray and "sort of begging for his life." In trial counsel's opinion, evidence that Gray was continuing to point a gun at Dellan under these circumstances could have been seen by the jury as excessive, therefore undercutting the self-defense theory. He added that Cross-Benson also did not provide a statement on the day of the incident.

Trial counsel testified, therefore, that "there were problems with each of the [three witnesses'] statements in terms of credibility." He explained,

ultimately, I talked to the witnesses with [Gray], and what we agreed was that we were going to put [Gray's son] up first of the witnesses, of Ms. Hughes, Ms. Charleston, Mr. Cross-Benson . . . . We chose to put up [Gray's son] first. And we said, we'll see how it goes. And if that testimony went well, you know, we decide whether to call them. So we put [Gray's son] up, his testimony went well. He didn't really get asked many questions. The State didn't try to, for example, impeach him on the fact that he saw the victim Mr. Lightburn reaching into his waist to grab a gun. So that sort of went uncontroverted after [Gray's son] got off the stand. But after he left, after he testified, I turned to [Gray] and I said, "you know, do you think we should call the rest of the witness[es]?" He was, "no." So there was no – we had no dispute between who we were going to call. Trial counsel testified that Gray's son gave a statement on the day of the incident establishing that Dellan had a gun, that he was the most credible witness, that he was the least likely witness to be subject to vigorous cross-examination, and that "generally when you have a criminal trial what you want to do is you want to present the most credible witnesses. You want a witness who could get on the stand and get off without being damaged by cross-examination from the State. Because if there is damage you could lose your trial just based on the testimony of one witness."

"The decision not to call witnesses . . . has been held reasonable where trial counsel testified to being concerned about the witnesses' credibility or that the witnesses' testimony might be counterproductive to the defense." *Rankin v. State*, 309

8

Ga. App. 817, 820 (2) (a) (711 SE2d 377) (2011). Here, trial counsel testified to explicit and considered reasons regarding his concerns about the three witnesses' credibility and/or their testimony being antagonistic to Gray's defense. Trial counsel further testified as to a corresponding strategy to allow Gray's son to be the first witness. In keeping with this decision, trial counsel presented a witness whom he considered credible, who did not face extensive cross-examination, and whose testimony supported Gray's self-defense theory, and trial counsel and Gray together chose not to present any further witnesses after observing that the testimony of Gray's son "went well." These decisions do not fall outside the wide range of reasonable professional assistance. *Williams v. State*, 253 Ga. App. 453, 454-455 (1) (a) (559 SE2d 512) (2002) (trial counsel's actions in failing to call five witnesses did not constitute ineffective assistance where counsel interviewed all of the potential witnesses, two witnesses were not called to testify due to credibility concerns, another witness was not called due to a tactical decision to preserve the final word in closing argument, each decision was made after consultation with the defendant, and trial counsel elicited the anticipated evidence through another witness); *Nichols v. State*, 257 Ga. 558, 558 (2) (a) (361 SE2d 486) (1987) (no ineffective assistance shown where counsel interviewed the three potential witnesses prior to trial and determined

9

that their testimony would not have been beneficial or would have been merely cumulative. "Counsel obviously considered presenting the testimony of these witnesses and made a strategic decision not to do so").

Gray insists that trial counsel's decision to not call the witnesses was unreasonable because (1) the police testified that Gray fled after the shooting, and the jury therefore knew this information; (2) at the time Hughes gave her initial statement she was never asked about the victims' possession or brandishing of a firearm; and (3) the police did not question Charleston on the date of the incident. Nevertheless, based on the record before us, the trial court properly concluded that trial counsel's decision to not call the three witnesses was not so patently unreasonable that *no* competent attorney would have made the same decision under the circumstances. Because Gray has failed to satisfy the deficient performance prong of the ineffective assistance test, his claim fails.

2. Next, Gray argues that the trial court committed reversible error in failing to instruct the jury on impeachment by a prior conviction. Even assuming that the trial court erred in this regard, any error was harmless.

During cross-examination, after Brandon testified that he had not been convicted of a violent crime, defense counsel elicited the admission that Brandon had

10

been convicted of child molestation — a conviction that was more than ten years old. During the charging conference, the trial court indicated that it would not give the charge on impeachment by a prior conviction because defense counsel had impeached Brandon based on an apparent falsity in Brandon's testimony.

Even assuming that the trial court erred in not charging the jury on impeachment by a prior conviction, however, "the attendant failure of the trial court to give the charge requested was harmless error because it is not highly probable that the error contributed to the verdict." *Cannon v. State*, 302 Ga. 327, 330-331 (3) (806 SE2d 584) (2017). "[D]espite not having specific instructions on impeachment by conviction, the trial court did properly instruct the jury on impeachment in general," id. at 331 (3), explaining to the jury that they could consider evidence that was offered to attack a witness's credibility. Also, the trial court allowed evidence of Brandon's guilty plea to the child molestation charge to go back with the jury during their deliberations. Accordingly, this enumeration does not present grounds for reversal.

3. Next, Gray contends that the trial court erred in permitting the State to introduce evidence that the police found currency and a scale with marijuana residue inside his home after the shooting. In Gray's view, this evidence was not relevant to

11

any issue in the case and amounted to bad character evidence that was prejudicial, and the trial court erred in finding it admissible pursuant to the res gestae doctrine. This argument is unavailing.

When one of the responding detectives testified that these items were found in the home, trial counsel did not object to the testimony.[3] We therefore review this enumeration of error under the plain error standard of review. *Albright v. State*, 354 Ga. App. 538, 546 (2) (841 SE2d 171) (2020) ("Because there was no contemporaneous objection, this contention is subject only to plain error review."). "A finding of plain error requires a clear or obvious legal error or defect not affirmatively waived by the appellant that must have affected the appellant's substantial rights, i.e., it affected the outcome of the trial court proceedings." (Citations and punctuation omitted.) Id.

---

[3] Gray objected to a photograph of the scale with marijuana residue on the basis of a lack of foundation, but withdrew the objection when the foundation was laid. He also objected to a photograph of money found in the wall on the basis of relevance, but made no objection to the officer's prior testimony regarding the money being found. Later in the trial, the trial court appeared to suggest that contemporaneous objections had been made, but subsequently found in its order on the motion for new trial that Gray did not object to the detective's testimony on this evidence. We further note that Gray does not argue that he properly objected.

Before the current Evidence Code became effective, "the concept of res gestae provided that all the acts and circumstances surrounding the charged offense were admissible even if they reflected upon the defendant's character." *Satterfield v. State*, 339 Ga. App. 15, 19 (1) (a) (792 SE2d 451) (2016). "This rule of admissibility has been carried forward to the [current] Evidence Code under the concept of 'intrinsic' evidence, as opposed to 'extrinsic' evidence, i.e., evidence of 'other crimes, wrongs, or acts,' which is subject to the admissibility requirements of OCGA § 24-4-404 (b)." Id. Intrinsic evidence includes evidence that is necessary to complete the story of the crime or inextricably intertwined with the evidence regarding the charged offense. (Citation omitted.) Id.

Evidence of other acts is inextricably intertwined with the evidence concerning the charged offense if "it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue." (Citation omitted.) *Smith v. State*, 307 Ga. 263, 271-272 (2) (c) (834 SE2d 1) (2019). During trial, the trial court found that the subject evidence was "intricately intertwined" with the charged offenses. In its order on the motion for new trial, the court found that the evidence was intrinsic evidence

13

because it completed the story of the crime and was inextricably intertwined with the evidence on the charged crimes in that it formed an integral and natural part of the brothers' accounts of the circumstances surrounding the charges.

We conclude that the trial court did not err, much less commit plain error. Dellan testified that the genesis of the confrontation at Gray's home was a marijuana sale in which Gray sold marijuana to Dellan's friend, that he asked Gray to return the friend's money, and that he became involved in the dispute because he knew that Gray had sold him a better quality of marijuana. According to Brandon, Gray demanded that he and Dellan fight at Gray's home because the "issue" (evidently, the marijuana sale) did not concern Dellan. And the State's theory of the case, as presented in its opening and closing arguments, was that the incident stemmed from an argument over marijuana, after which Gray baited Dellan into coming to his home to fight before shooting him. Accordingly, we determine that the evidence of the currency and scale with marijuana residue found at Gray's home was inextricably intertwined with the other evidence that the brothers provided about the shooting, and that it partly advanced the State's theory of the case and was necessary to complete the story of the crime for the jury. See *Priester v. State*, __ Ga. __ (2) (__SE2d__) (2020), Case No. S20A0444, slip op. at *2 (2) (witnesses' testimony that the

14

defendant engaged in the business of dealing drugs and that the business had slowed "was an integral and natural part of their accounts of the circumstances surrounding the shooting"); *Smith*, supra, 307 Ga. at 272 (2) (c) (witness's statements regarding the defendants' drug use and possible drug sales were inextricably intertwined with his testimony regarding the shooting, advanced the State's theory that the shooting was a culmination of drug-related robberies, and were necessary to complete the story of the crime).[4] Because Gray does not demonstrate plain error in the trial court's decision to admit the evidence at issue, this argument fails.

4. Lastly, Gray contends that the cumulative effective of the trial court's errors and the ineffective assistance of counsel deprived him of a fair trial.

As discussed above, however, trial counsel did not render ineffective assistance, and the trial court did not err in admitting the evidence of the scale with marijuana residue and currency found inside Gray's home. Because any presumed error discussed in Division 2 did not harm Gray, this enumeration does not warrant reversal. *Showers v. State*, 353 Ga. App. 754, 761 (2) (d) (839 SE2d 245) (2020) (rejecting the

---

[4] Although Gray briefly mentions that the evidence was prejudicial, Gray does not show that it was *unfairly* prejudicial. See *Smith*, supra, 307 Ga. at 273 (2) (c) (evidence was not unfairly prejudicial because the State had some need for it, it gave context as to why the series of events occurred, and the evidence was connected in time with the series of incidents leading up to the shooting).

15

defendant's cumulative error argument where the trial court made a single error in failing to give an accomplice jury charge but the error did not probably affect the outcome of the trial).

For the reasons discussed above, we affirm the judgment of conviction, sentence, and the denial of Gray's motion for new trial.

*Judgment affirmed. Mercier and Coomer, JJ., concur.*