312 Ga. 481
FINAL COPY

S21A0807.  JOHNSON v. THE STATE.

NAHMIAS, Chief Justice.

Appellant Raphael Johnson was convicted of the malice murder of Frederick Burke, the felony murder of James Cornelius, and other crimes in connection with a shooting incident at a "gambling house" on August 13, 2013, and the aggravated battery of Ahmed Rayner in connection with another shooting at a restaurant a week later. In his appeal to this Court, Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions for the aggravated battery of Rayner, that the trial court's jury instruction on aggravated assault constituted plain error, and that the trial court abused its discretion by concluding that evidence of another shooting incident that occurred a few hours before the gambling house shootings was admissible as intrinsic evidence. As explained below, we reject these contentions and affirm

Appellant's convictions, except for his conviction for possession of a firearm during the commission of a felony, which we vacate to correct a merger error.[1]

---

[1] The crimes occurred on August 13 and 20, 2013. In November 2013, a Fulton County grand jury indicted Appellant for the following crimes in connection with the August 13 shooting incident: malice murder of Burke, three counts of felony murder of Burke, aggravated assault of Burke, felony murder of Cornelius (based on the aggravated assault of Burke), armed robbery of Bryan Cornelius, aggravated battery of Bryan, aggravated assault of Bryan, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and use of a firearm by a convicted felon during the commission of a felony. In connection with the shooting on August 20, Appellant was indicted for two counts of aggravated battery of Rayner (one by seriously disfiguring his buttock and one by seriously disfiguring his thigh), attempted armed robbery, aggravated assault, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and use of a firearm by a convicted felon during the commission of a felony. Appellant was also indicted for one count of participating in criminal street gang activity between August 13 and 20.

The trial court later bifurcated the counts of possession and use of a firearm by a convicted felon related to the August 20 shooting, and on March 10, 2016, the first day of Appellant's trial, the court nolle prossed the attempted armed robbery count. On March 18, 2016, the jury found Appellant guilty of the remaining counts. The trial court sentenced him as a recidivist to serve three consecutive sentences of life in prison without the possibility of parole for the malice murder of Burke, felony murder of Cornelius, and armed robbery of Bryan; 20 consecutive years for the aggravated battery of Bryan; five consecutive years for the count of possession of a firearm during the commission of a felony related to the August 13 shootings; 15 consecutive years on probation for the count of use of a firearm by a convicted felon during the commission of a felony related to the August 13 shootings; 20 consecutive years for each of the counts of aggravated battery of Rayner; five consecutive years on probation for the count of possession of a firearm during the commission of a felony related to the August 20 shooting; and 15 consecutive years for the gang-activity count. The remaining felony murder counts were vacated by

1. The evidence presented at Appellant's trial showed the following.

(a) *The Gambling House Shootings.*

In August 2013, James Cornelius operated an illegal "gambling house" where people met to play high-stakes card games and use gambling machines in a building on Lee Street in Atlanta. On the night of August 12, Cornelius's grandson Bryan Cornelius ("Bryan") and his friend Frederick Burke were working at the gambling house.

At trial, Bryan testified as follows. Late that night, Quinton Porter, who frequented the gambling house and whom Bryan knew only as "Big Boo," walked outside to the parking lot, where he spoke with some men who had arrived in a silver Ford Taurus. Three of the men in the Taurus came to the door of the gambling house. Burke assumed that the men were with Big Boo, let them in, and

operation of law; the counts of aggravated assault of Burke, Bryan, and Rayner and the remaining count of possession of a firearm by a convicted felon merged; and the court nolle prossed the bifurcated firearm counts.

Appellant filed a timely motion for new trial, which he amended through new counsel in June 2019. After Appellant waived a hearing on the motion, the trial court denied it in January 2021. Appellant then filed a timely notice of appeal, and his case was docketed to the April 2021 term of this Court and orally argued on June 8, 2021.

then went outside. Bryan was inside. A few minutes later, one of the men pulled out "a gun," pointed it at Bryan, and said "You already know what this is. Get on the ground." Bryan ran toward the assailant, slamming him against the door, and the assailant started shooting. As Bryan pulled out his own gun, he was shot, and he fell to the ground. The assailant pointed his gun at Bryan's head and said, "Let it go, let it go right now or I will kill you." Bryan dropped his gun. Burke then opened the door, and the assailant shot Burke several times. The assailant took Bryan's gun; Bryan heard him and the other two men go toward the back of the building. A short time later, the three men stepped over Bryan as they left the building and fled in the Taurus. Bryan then saw Cornelius, who was near the back of the building, grab his chest and fall to the floor. Someone at the gambling house called 911.[2]

---

[2] During the 911 call, which was audio recorded and played for the jury, Bryan described the shooter as "tall," about 5′9″ or 5′10″. He later told a responding officer that one of the assailants was about 6′0″ tall and weighed about 140 pounds; he described another assailant as about 5′8″ tall.

Two witnesses who were near the back of the gambling house testified that they heard gunshots but did not see the shootings. One of those witnesses

Burke, Cornelius, and Bryan were taken to a hospital. Burke and Cornelius died several days later. Burke's autopsy showed that he was shot multiple times and died from complications of gunshot wounds to his torso; no bullets were recovered from his body. Cornelius's autopsy showed that he died from a heart attack caused by the stressful criminal event. Bryan was shot at least four times; he ultimately recovered, although it was nearly two years before he could walk again. A .45-caliber bullet was removed from Bryan's body while he was being treated at the hospital. A crime scene investigator found a .45-caliber bullet, two .45-caliber shell casings, and two .40-caliber shell casings at the gambling house.

In the days after the shootings, Bryan's father showed Bryan two photos on the father's cell phone and asked if Bryan recognized anyone. Bryan identified one of the men in the photos as the shooter.

---

testified that two armed assailants then demanded and took money, keys, and pants from some of the other gamblers and left. That witness also testified that the two assailants he saw were tall, thin men; the other witness testified that one of the assailants was "slim." The jury saw Appellant in the courtroom; an August 2013 jail booking report in the record but not presented in evidence says that Appellant is 6´4´´ tall and weighed 210 pounds.

During an interview on August 18, Bryan showed a detective the photos, and the detective later determined that the man whom Bryan identified was Appellant. The next day, the detective showed Bryan a photo lineup, and Bryan identified Appellant as the shooter. Bryan repeated that identification at trial.

Another investigator obtained video recordings from surveillance cameras in the parking lot outside the gambling house. The recordings, which the prosecutor accurately described in her opening statement as "grainy," were played during the trial, and Bryan testified about them. The recordings show the following. At 11:13 p.m., a silver Taurus parked near the gambling house, and a tall man, whom Bryan identified at trial as Appellant, got out.[3] At least three other men were in the car. Porter and others came outside the gambling house and talked with Appellant for about 30 minutes. At 11:48, Appellant got back in the Taurus, while Porter and another man got in a nearby SUV. At 12:03 a.m., Appellant and

[3] The prosecutor also showed the surveillance video recordings to another witness who was in the parking lot that night. The witness testified that he "believe[d]" that the tall man shown on the recordings was Appellant.

6

two other men got out of the Taurus and walked toward the gambling house. At 12:07, the SUV drove away. At 12:08, Appellant, who was carrying clothing, and the two other men ran back to the Taurus, jumped in, and sped away.

(b) *The Restaurant Shooting.*

Shortly after 10:00 p.m. on August 20, a week after the shootings at the gambling house, Ahmed Rayner was shot multiple times as he left a restaurant on Peachtree Road in Atlanta. A detective obtained video recordings from the surveillance cameras at the restaurant; the recordings were later played for the jury. The video recordings show the following. At 9:28 p.m., two Dodge Chargers pulled into the restaurant parking lot and parked, one behind the other. A tall man, whom a hostess at the restaurant later identified in a photo lineup and at trial as Appellant, and a shorter man got out of the first Charger and went into the restaurant. About 15 minutes later, the shorter man went back to the first Charger; sat in the passenger's seat for a moment; walked toward the other Charger, which was partially out of view of the surveillance

cameras; and then returned to the restaurant. Appellant and the shorter man eventually were seated a few tables away from Rayner, who was dining with several other people. At 10:07 p.m., some members of Rayner's party stood up, as if preparing to leave, and about a minute later, Appellant appeared to be talking on his cell phone. At 10:10 p.m., Rayner and his companions exited the restaurant.

Moments later, the second Charger pulled up near the exit, and a man got out of the passenger's seat pointing a handgun. Rayner ran back into the restaurant, with the assailant following and shooting. The assailant ran out of the restaurant seconds later and fled in the Charger. Rayner then limped into the dining area, where he fell to the floor. Appellant, who had ducked under a table when the shooting began, appeared to be talking on his cell phone while several bystanders attended to Rayner. The shorter man then went outside and got into the remaining Charger. Appellant exited the restaurant about seven minutes after the shooting. In the parking lot, several members of Rayner's party appeared to speak to

8

Appellant. They then chased him before he got in the Charger, which sped away.

Two responding police officers testified that Rayner had been shot and was taken to a hospital. A crime scene investigator found two .45-caliber shell casings inside the restaurant. Crime scene photographs showed that there were bloodstains on the ground near the entrance to the restaurant and on the carpet in the dining area. The State also introduced into evidence Rayner's medical records, which showed that he suffered gunshot wounds to his right thigh, left buttock, and left thigh.[4]

(c) *Appellant's Arrest.*

Six days after the restaurant shooting, on August 26, police

---

[4] The medical records also showed the following: Rayner was transported in an ambulance to the hospital, where his condition was designated "Trauma: Level 1"; he reported "acute pain," had "moderate" to "mild" bleeding, and was unable to lie on his back due to the gunshot wounds; x-rays showed that there were bullet fragments embedded near the gunshot wounds; he "denied paresthesias or loss of movement" and there was no evidence of "compartment syndrome or vascular compromise"; and on the day after the shooting, he was discharged from the hospital in a wheelchair with a prescription for the painkiller oxycodone. Rayner did not testify at trial. The prosecutor told the trial court outside the presence of the jury that Rayner lived in Ohio and refused to return to Georgia to testify.

officers arrested Appellant, who was a convicted felon, in a park, where he was hanging out with Latavious Hunter. Hunter was also arrested after he pointed his .45-caliber handgun at the officers.

Appellant was interviewed in connection with the gambling house shootings later that day; the interview was audio and video recorded, and the recording was played for the jury. During the interview, Appellant claimed that he arrived at the gambling house in a gray Nissan Altima around 10:00 on the night of the shootings; he asked his friend Big Boo (Porter) for $20 so that he could go to a club; and after a few minutes, he left. Appellant denied being a member of a gang or participating in the robbery and shootings, and he told investigators that he had heard that his cousin and two other men committed the crimes.

Ten days later, a detective interviewed Porter, who claimed that his friend "Ralph," whom he identified in a photo lineup as Appellant, came to the gambling house parking lot on the night of the shootings; that he gave Appellant $20 and then left the gambling house; and that he was not involved in planning the robbery. Porter

also testified at trial, claiming that he did not remember being at the gambling house on the night of the shootings or being interviewed by the detective.

(d) *The Boulevard Place Shootings.*

The State also presented evidence that around 8:30 p.m. on August 12, about three-and-a-half hours before the gambling house shootings, another shooting incident occurred on Boulevard Place in Atlanta. A responding police officer testified that Travis Montford and another man were shot. Neither of the victims could identify who had shot them, but a woman at the scene called out to the officer, "It was a silver Ford Taurus." A crime scene investigator testified that he collected a 9mm shell casing, five 7.62-caliber shell casings, three .40-caliber shell casings, seven .45-caliber shell casings, and a .45-caliber bullet.

(e) *Additional Evidence at Trial.*

A firearms examiner testified that the .40-caliber shell casings found at the crime scene on Boulevard Place were fired from the same gun as the .40-caliber shell casings found at the gambling

11

house. There were also at least two .45-caliber handguns used in the Boulevard Place shooting. Three of the seven .45-caliber shell casings found at that scene were fired from the same gun as both .45-caliber shell casings found at the gambling house. The .45-caliber bullet found at the Boulevard Place scene was fired from the same gun that fired the .45-caliber bullet found at the gambling house and the .45-caliber bullet that was removed from Bryan's body. None of the shell casings or bullets found in connection with the gambling house shootings was fired from the .45-caliber handgun found on Hunter when he was arrested with Appellant. However, the remaining four .45-caliber shell casings found at the Boulevard Place scene and the two .45-caliber shell casings found at the restaurant were fired from the .45-caliber gun later found on Hunter.

The State's gang expert testified that Appellant and Hunter were members of the Atlanta Blood Gang ("ABG"), an affiliate of the Bloods gang; that Porter was also affiliated with the Bloods gang; and that Montford (one of the victims in the Boulevard Place

shootings) was a member of the rival Crips gang. To prove Appellant's membership in ABG, the State also presented evidence of two rap music videos that promoted songs referencing ABG, which featured Appellant and other ABG members; still images from the videos showing Appellant wearing a shirt with "ABG" on it; and the gang expert's testimony that Appellant had "ABG" tattooed on his arm. Bryan testified that he was not a gang member and did not know Appellant, and the State presented no evidence that Rayner was associated with a gang or knew Appellant. However, the gang expert testified that gang members often "work" for the gang by committing armed robberies and shootings and that the incidents at the gambling house and restaurant were related to gang activity.

Appellant did not testify. His theory of defense was that Bryan's descriptions of the shooter at the gambling house did not match Appellant; that the evidence did not show that Appellant planned or participated in the restaurant shooting; and that the case

was not adequately investigated.[5]

2. OCGA § 16-5-24 (a) says, in pertinent part, that "[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by . . . seriously disfiguring his or her body or a member thereof." Appellant was indicted for two counts of aggravated battery for "maliciously caus[ing] bodily harm to . . . Rayner by seriously disfiguring his [buttock (Count 13) and thigh (Count 14)] . . . by shooting him with a handgun," and the jury found him guilty of both counts. Appellant now contends that the evidence presented at his trial was legally insufficient to support those convictions because the State failed to prove that Rayner was "seriously disfigur[ed]." We disagree.[6]

As a matter of due process under the Fourteenth Amendment to the United States Constitution, we evaluate the sufficiency of

---

[5] The record does not indicate if any of the other assailants in the Boulevard Place, gambling house, or restaurant shootings were ever identified or prosecuted.

[6] We note that Appellant does not dispute that the evidence was legally sufficient for the jury to find him guilty as a party to the attack on Rayner by the unidentified gunman, see OCGA § 16-2-20 (a) (defining "parties to a crime"), nor that the evidence was sufficient to support his other convictions.

14

evidence by determining whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "In conducting that evaluation, 'it is not the job of this Court to weigh the evidence on appeal or resolve conflicts in trial testimony but rather to examine the evidence in the light most favorable to the verdict.'" *Byers v. State*, 311 Ga. 259, 266 (857 SE2d 447) (2021) (citation and punctuation omitted).

This Court has explained that,

[a]lthough the Criminal Code does not define "seriously disfiguring" as used in the aggravated battery statute, see OCGA § 16-5-19, that term generally has been construed as meaning "gravely or greatly impairing or injuring the appearance of a member of a victim's body, even if only temporarily." "Aggravated battery predicated upon serious disfigurement, whether temporary or permanent, requires proof that the injury inflicted was more than a superficial wound, that is, a scrape, bruise, discoloration, or swelling." "Inasmuch as the circumstances inevitably vary in each case of aggravated battery, whether disfigurement is serious is best resolved by the factfinder on a case-by-case basis and is almost always a question for the jury."

*Byers*, 311 Ga. at 266 (citations omitted). When viewed in the light most favorable to the verdicts, the evidence presented at Appellant's

15

trial — including the surveillance video and photos from the restaurant, testimony from the responding officers, and Rayner's medical records — showed that after the assailant shot Rayner in his buttock and thighs, he bled on the restaurant's entrance and carpet as he limped back into the restaurant and fell to the floor. He was then taken by ambulance to a hospital, where he reported acute pain and was still bleeding. X-rays showed bullet fragments embedded near the gunshot wounds, and Rayner could not lie on his back due to the wounds. He was discharged from the hospital in a wheelchair with a prescription for a painkiller.

This evidence authorized a rational jury to infer that Rayner suffered disfigurement that was serious, not merely superficial. See *Byers*, 311 Ga. at 266 (concluding that evidence that the victim "bled from the head so profusely that there was blood on the couch, floor, and wall authorized the jury to infer that [he] in fact suffered disfigurement [from a visible head wound] that was not merely superficial, but serious" under OCGA § 16-5-24 (a)). Compare *Williams v. State*, 248 Ga. App. 316, 317-319 (546 SE2d 74) (2001)

16

(reversing the defendant's aggravated battery conviction because there was insufficient evidence that the victim was seriously disfigured by the defendant's attack, which left bruises and scratches on her face, where there was no evidence that she was bleeding, received any medical treatment after the attack, or was scarred).

Appellant asserts that the State should have introduced testimony about Rayner's medical treatment as well as photos and x-rays of his injuries to prove that he was seriously disfigured. But as we have explained many times before, "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Howell v. State*, 307 Ga. 865, 872 (838 SE2d 839) (2020) (citation and punctuation omitted). This enumeration of error is meritless.

3. Appellant next contends that the trial court committed plain error when it instructed the jury on aggravated assault and that his convictions for aggravated assault and felony murder based on that

17

offense should therefore be reversed. As an initial matter, Appellant's claim that his aggravated assault "convictions" should be reversed is moot. Appellant was not convicted of or sentenced for aggravated assault, because those counts all merged. See footnote 1 above; *Solomon v. State*, 304 Ga. 846, 849 (823 SE2d 265) (2019). And as to his felony murder conviction, Appellant has not carried his burden of establishing plain error, because he has not shown that any alleged error in the aggravated assault instruction likely affected the outcome of his trial.

Appellant was indicted for the felony murder of Cornelius based on the count of aggravated assault with a deadly weapon which alleged that Appellant "did unlawfully commit an assault upon the person of Frederick Burke, by shooting him with a handgun, the same being a deadly weapon." See OCGA § 16-5-21 (a) (2) ("A person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon[.]").[7] The State asked the

_____

[7] As discussed above, Cornelius's autopsy showed that he died from a heart attack caused by witnessing the attack at the gambling house.

trial court to give the pattern jury instruction defining aggravated assault with a deadly weapon, which says (in pertinent part and with parentheses omitted):

> A person commits the offense of aggravated assault when that person assaults another person with a deadly weapon . . . .
> To constitute such an assault, actual injury to the alleged victim need not be shown. It is only necessary that the evidence show beyond a reasonable doubt that the defendant attempted to cause a violent injury to the alleged victim . . . .
> The State must also prove as a material element of aggravated assault, as alleged in this case, that the assault was made with a deadly weapon . . . .

Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 2.20.21 (4th ed. 2007). During the charge conference, the trial court said that it would give the pattern instruction. During the final charge, however, just after the court instructed the jury on the definition of armed robbery, the court read the jury the second and third paragraphs of this pattern instruction but omitted the first paragraph.

As Appellant acknowledges, he failed to object to this omission, so our review of his claim is limited to plain error. See OCGA § 17-

8-58 (b); *Knighton v. State*, 310 Ga. 586, 591 (853 SE2d 89) (2020).

To establish plain error, Appellant must show that

> the alleged instructional error was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings. An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be.

*Knighton*, 310 Ga. at 591 (citations and punctuation omitted).

Assuming without deciding that the trial court's omission of the first paragraph of the pattern instruction was a clear and obvious error, Appellant has not shown that it likely affected the outcome of his trial. As we have often explained, "[w]e do not evaluate jury charges in isolation, but rather consider them as a whole to determine whether there is a reasonable likelihood the jury improperly applied a challenged instruction." *Walker v. State*, 311 Ga. 719, 724 (859 SE2d 25) (2021) (citation and punctuation omitted). At the beginning of the final charge, the trial court read the indictment to the jury, including the count of "aggravated assault with a deadly weapon" alleging that Appellant "commit[ted]

20

an assault" on Burke "by shooting him with a handgun, the same being a deadly weapon." The court later read the second and third paragraphs of the pattern instruction defining "aggravated assault", which informed the jury that the State was required to prove that Appellant assaulted Burke by attempting to cause him a violent injury and that the assault must have been made with a deadly weapon in order to constitute an aggravated assault. The court also instructed that a firearm, when used as such, is a deadly weapon as a matter of law, and fully instructed the jury on the crime of felony murder. Moreover, the court instructed the jury during the preliminary and the final charge that the State was required to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt, and the jury was provided copies of the indictment and the final charge during its deliberations.

Considering the instructions as a whole, the jury was adequately informed that a defendant commits aggravated assault when he assaults another person with a deadly weapon. And the

evidence that Burke was shot (and killed) with a handgun was overwhelming and undisputed by Appellant; his defense was instead that he was not involved in that crime. Thus, Appellant has not shown that the trial court's omission of the first paragraph of the pattern instruction amounted to plain error. See *Anderson v. State*, 309 Ga. 618, 622-625 (847 SE2d 572) (2020) (holding that the appellant did not show that the trial court's failure to give a separate instruction to the jury on the elements of possession of a firearm during the commission of a felony likely affected the outcome of his trial under the third part of the plain error test, in part because the court read to the jury the indictment, which was also sent out with the jury during its deliberations, and instructed that the State was required to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt). See also *Neder v. United States*, 527 U.S. 1, 17 (119 SCt 1827, 144 LE2d 35) (1999) ("[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict

would have been the same absent the error, the erroneous instruction is properly found to be harmless."); *United States v. Abovyan*, 988 F3d 1288, 1306-1308 (11th Cir. 2021) (concluding that the trial court's failure to instruct the jury on the elements of healthcare fraud, where the defendant was charged with conspiracy to commit healthcare fraud, did not amount to plain error, because the trial court referred to and the jury was given a copy of the indictment, which tracked the elements of healthcare fraud, the court instructed on the elements of conspiracy, and there was no dispute that healthcare fraud did occur).

4. Finally, Appellant argues that the trial court abused its discretion by ruling that evidence related to the shootings on Boulevard Place was admissible as intrinsic evidence. We can assume without deciding that Appellant preserved this claim for ordinary appellate review, because he has not shown that the trial court's ruling was an abuse of discretion. See *Harris v. State*, 310 Ga. 372, 377 (850 SE2d 77) (2020) (explaining that when the defendant objected at trial to the admission of evidence as intrinsic,

23

the trial court's ruling is reviewed on appeal for abuse of discretion).

Evidence is admissible as "intrinsic" evidence "'when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense.'" *Smith v. State,* 307 Ga. 263, 271 (834 SE2d 1) (2019) (citation omitted). In applying this test, we have explained that "'[e]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime.'" Id. (citation omitted). In addition, intrinsic evidence must satisfy OCGA § 24-4-403 ("Rule 403"), which says in pertinent part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" However, "[t]he exclusion of relevant evidence under Rule 403 is an extraordinary remedy that trial courts should grant only sparingly." *Smith*, 307 Ga. at 273.

In this case, Appellant was charged with participating in

criminal street gang activity, and the State's theory was that he was involved in the gambling house shootings (with Bloods gang affiliate Porter and several unidentified assailants) and the restaurant shooting (with several unidentified assailants) as part of his "work" for the Bloods-affiliated gang ABG. The evidence related to the Boulevard Place shootings added significant weight to that theory, because that evidence was linked in time and circumstances with the charged crimes and one victim was a member of a rival gang. Most significantly, the ballistics evidence from the Boulevard Place crime scene linked the gambling house and restaurant shootings to each other and to the ABG gang. The .40-caliber and .45-caliber handguns used during the gambling house shootings were also used in the Boulevard Place shootings, as was the .45-caliber handgun used during the restaurant shooting, which another ABG member (Hunter) was carrying when he and Appellant were arrested together less than a week after the restaurant shooting. In addition, the Boulevard Place shootings occurred just a few hours before the gambling house shootings and about a week before the restaurant

25

shooting. The Boulevard Place, gambling house, and restaurant incidents each involved multiple assailants working together to shoot the victims; the assailants used a silver Ford Taurus during both the Boulevard Place and gambling house shootings; and the gang expert's testimony indicated that the three incidents were related to ABG's gang activity.

Thus, even though the State did not charge Appellant in connection with the Boulevard Place shootings, evidence of that incident was relevant to disputed issues in the case. See OCGA § 24-4-401 ("'[R]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (explaining that evidence of the appellant's gang membership was relevant to his motive to commit the charged crimes); *United States v. Hill*, 518 Fed. Appx. 744, 748 (11th Cir. 2013) (rejecting the appellant's argument that intrinsic evidence was not relevant because it did not establish that he was involved in

a drive-by shooting of the house of a confidential informant who provided information about the drug trade, where the evidence showed that the shooting occurred six days after the police discovered the appellant with drugs and the appellant's phone was used to make a threatening call to the informant about an hour before the shooting). And because the Boulevard Place evidence pertained to the chain of events in this case by connecting the gambling house and restaurant incidents to each other and to Appellant and by indicating that these incidents were related to the ABG gang, the evidence was reasonably necessary to complete the story of the crimes for the jury and therefore intrinsic to the crimes charged. See, e.g., *Smith*, 307 Ga. at 272-273 (concluding that a witness's statements about the appellants' sale and use of drugs were admissible as evidence intrinsic to the charged offenses of murder and related crimes because they were reasonably necessary to complete the story of the crimes, where the statements advanced the State's theory of the case that the charged offenses were a culmination of drug-related robberies); *Fleming v. State*, 306 Ga.

27

240, 245 (830 SE2d 129) (2019) (holding that evidence of the appellant's gang affiliation was admissible as evidence intrinsic to the charged offenses of murder and other crimes because it completed the story of the crimes and enabled the State to explain his association with the shooters and his role in the crimes).

Turning to the analysis under Rule 403, the evidence of the Boulevard Place incident had significant probative value. See *Olds v. State*, 299 Ga. 65, 75 (786 SE2d 633) (2016) (explaining that the probative value of evidence depends in part on whether the fact it is offered to prove is disputed and on its marginal worth in proving that fact in comparison to other available proof). The State needed evidence to show the connection between Appellant, his gang membership, and the charged crimes. Only one eyewitness (Bryan) identified Appellant as a shooter at the gambling house, and Appellant argued at trial that the identification was not credible; Porter recanted his police interview statement that Appellant was at the gambling house that night; and another witness testified that he merely "believe[d]" that Appellant was the tall man shown on the

28

parking lot surveillance recordings. The evidence that Appellant was involved in the restaurant shooting was entirely circumstantial. And the only evidence that the gambling house and restaurant incidents were committed to benefit the gang was the gang expert's rather conclusory testimony. Although the State presented evidence that Appellant was a member of ABG, during his police interview, he denied being in a gang and denied any involvement in the gambling house shootings. Beyond linking the guns used in the gambling house and restaurant shootings, the evidence of the Boulevard Place shootings (which had a more obvious gang-related motive) tended to prove Appellant's motive and helped the State explain why Appellant committed crimes with groups of unidentified assailants against victims to whom he had no apparent connection.

The evidence of the Boulevard Place incident was also prejudicial, as is all inculpatory evidence, but in light of its significant probative value, it was not a "'matter of scant or cumulative probative force, dragged in by the heels for the sake of

its prejudicial effect.'" *Smith*, 307 Ga. at 273 (citation omitted). See also *Heade v. State*, ___ Ga. ___, ___ (860 SE2d 509) (2021) ("'[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that (Rule 403) permits exclusion.'" (emphasis in original) (quoting *Anglin*, 302 Ga. at 337)). Moreover, the prejudicial effect of the Boulevard Place evidence was mitigated by the trial court's instruction limiting the jury's consideration of the evidence. Although the Boulevard Place evidence was intrinsic to all of the crimes charged, the trial court instructed the jury before the evidence was presented and again during the final charge that the evidence could be considered only to prove the count of participating in criminal street gang activity and not for any other purpose. See *Heade*, ___ Ga. at ___ (explaining that the trial court's instruction limiting the jury's consideration of intrinsic evidence "reduced the prejudicial impact" of the evidence). Any prejudicial effect also was reduced by the prosecutor's acknowledgment during her opening statement that the State would not prove that Appellant was

present during the Boulevard Place incident. For these reasons, we see no abuse of discretion in the trial court's implicit conclusion that the probative value of the Boulevard Place evidence was not substantially outweighed by its prejudicial effect.

Because the trial court did not abuse its discretion in admitting the Boulevard Place evidence, Appellant's claim fails. See, e.g., *Smith*, 307 Ga. at 273; *Fleming*, 306 Ga. at 245.

5. Although Appellant has not raised in this Court any issue about his sentencing, we have noticed that the trial court clearly erred by failing to merge the count of possession of a firearm during the commission of a felony related to the gambling house shootings (Count 11) with his conviction on the count charging use of a firearm by a convicted felon during the commission of a felony, which was also related to the gambling house shootings (Count 17). See *Atkinson v. State*, 301 Ga. 518, 521 (801 SE2d 833) (2017). We therefore vacate Appellant's conviction and sentence on Count 11. See id. See also *Dixon v. State*, 302 Ga. 691, 696 (808 SE2d 696) (2017) (discussing this Court's discretion to correct obvious merger

errors on direct appeal).

*Judgment affirmed in part and vacated in part. All the Justices concur, except LaGrua, J., disqualified.*

Decided September 21, 2021.

Murder. Fulton Superior Court. Before Judge LaGrua.

*Steven E. Phillips, Brian Steel*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Ruth M. Pawlak, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.